MALCOLM M. LOWDER, MARK T. LOWDER, AND DEAN A. LOWDER v. ALL
STAR MILLS, INC., LOWDER FARMS, INC., CAROLINA FEED MILLS, INC.,
ALL STAR FOODS, INC., ALL STAR HATCHERIES, INC., ALL STAR INDUS-
TRIES, INC., TANGLEWOOD FARMS, INC., CONSOLIDATED INDUSTRIES,
INC., AIRGLIDE, INC., AND W. HORACE LOWDER

Nos. 67 and 112

(Filed 6 January 1981)

### 1. Corporations § 29— mismanagement of corporation — corporation in danger of insolvency — sufficiency of evidence

Where defendant was accused of mismanaging, diverting, converting and wasting corporate assets, the trial court's order appointing operating receivers was proper and evidence was sufficient to support the court's finding that the corporate defendants were in imminent danger of becoming insolvent where the evidence tended to show that individual defendant borrowed substantial sums from all of the corporate defendants for his own personal benefit, the gross income income and the net worth of the corporate defendants had drastically decreased under defendant's management, the physical assets of the corporate defendants had been grossly neglected by defendant who had failed and refused to repair or replace the assets, and the corporate defendant's federal income tax affairs were so improperly managed by individual defendant that the companies were subject to several million dollars in tax liabilities as well as the risk of loss of millions of dollars in interest and penalties. Moreover, even if the corporate defendants were not in imminent danger of insolvency within the purview of G.S. 1-507.1, the findings of fact supported numerous other grounds for the appoint-ment of receivers by the trial court in the exercise of its inherent equitable powers.

### 2. Corporations § 29— appointment of receivers — notice to defendants

There was no merit to defendants' contention that the initial order of the trial court appointing operating receivers was void because certain shareholders were not given notice of the proceedings and were thereby denied their due process rights to notice prior to a court proceeding, the outcome of which would affect their property interests, since there is no requirement in the statutes that notice be given to persons who are not parties to the action and since defendants, the allegedly aggrieved shareholders, moved prior to the initial hearing on plaintiffs' application for appointment of receivers to dismiss the application and noted specifically that they had received and read a copy of plaintiff's complaint, thereby admitting actual prior notice of the proceedings and therefore waiving any error in the failure of plaintiffs to give notice.

### 3. Corporations § 29; Receivers 1— receivers appointed by judge rotating out of district — jurisdiction retained by judge

G.S. 1-501, which provides that a superior court judge assigned to a district who appoints receivers while holding court in that district may retain jurisdic-tion of the original action and of the receivers appointed therefor following his rotation out of the district, became effective on May 8, 1979, the date it was

ratified, so that it applied to this action which was pending, and the trial judge could properly enter an order retaining jurisdiction in himself of all matters in this action notwithstanding his rotation out of the district.

**4. Appeal and Error § 16— authority of trial court after notice of appeal given**

Since the corporate defendants' subsequent perfection of their appeal related back to the time of the giving of notice of appeal, all orders entered by the trial judge after defendants' notice of appeal were void for want of jurisdiction, and orders approving the payment of fees and expenses for attorneys, accountants and receivers must therefore be vacated.

**5. Appeal and Error § 16; Contempt of Court § 8— appeal from contempt order — jurisdiction of trial court ousted**

Defendant's oral notice of appeal of the trial court's 21 February contempt order ousted jurisdiction from the trial court as to any further contempt proceedings in the same matter and the trial court's order entered at a 28 February hearing imposing sanctions for contempt was null and void.

**6. Contempt of Court § 1.1— defendant ordered to produce records — failure to do so as civil or criminal contempt**

Where defendant was accused of mismanaging, diverting and wasting corporate assets and the trial court ordered him to cooperate with receivers of the corporation and to provide them and plaintiffs with copies of his tax returns and a list of his assets, defendant's contempt, if any, in failing to provide the required materials could be criminal or civil, and contemnor waived procedural requirements when he came into court to answer charges of the trial court's show cause order.

**7. Contempt of Court § 6; Constitutional Law § 24.2— contempt proceeding based on affidavit — right to confront witness abridged**

The N. C. and U. S. Constitutions preserve the right of confrontation of the witnesses against an accused and this right is applicable to contempt proceedings so that an adjudication of contempt against defendant based on the affidavit of the receiver of a corporation was invalid.

**8. Contempt of Court § 6; Constitutional Law § 74— order to produce tax returns — Fifth Amendment protection not applicable**

Where defendant was accused of mismanaging, diverting, converting and wasting corporate assets, defendant's refusal to comply with the trial court's order to produce tax returns was not protected by the Fifth Amendment proscription against compulsory self-incrimination since there was no evidence tending to show defendant was under any physical or mental coercion at the time he prepared his tax returns, and he therefore could not rely upon the contents of the tax returns to support his claim of Fifth Amendment protection.

**9. Contempt of Court § 6; Constitutional Law § 74— order to produce tax returns — no authentication supporting claim of Fifth Amendment privilege**

Where defendant was accused of mismanaging, diverting, converting and wasting corporate assets and he was ordered by the trial court to produce his tax returns, the production of the returns did not amount to such authentication as to be compelled testimonial self-incrimination which would support a claim of Fifth Amendment privilege.

Justice BROCK did not participate in the consideration or decision of this case.

Case No. 112 is on discretionary review to review, prior to determination by the Court of Appeals, interlocutory orders entered by *Seay, J.*, on 9 February 1979 and 20 May 1980, STANLY Superior Court, appointing receivers for defendant corporations and approving fees for accountants, attorneys and receivers.

Case No. 67 is on discretionary review to review the decision of the Court of Appeals, reported in 45 N.C. App. 348, 263 S.E.2d 624, reversing judgments of *Seay, J.*, finding defendant in contempt, entered 21 February 1979 at UNION Superior Court and 2 March 1979 at STANLY Superior Court.

Case No. 112 is a shareholder's derivative action instituted by Malcolm M. Lowder and his two sons, Mark T. and Dean A. Lowder, shareholders of All Star Mills, Inc. (hereinafter referred to as "Mills"), Lowder Farms, Inc. (hereinafter referred to as "Farms"), Consolidated Industries, Inc. (hereinafter referred to as "Consolidated"), and alleged beneficial shareholders of All Star Foods, Inc. (hereinafter referred to as "Foods"). All Star Hatcheries, Inc. (hereinafter referred to as "Hatcheries"), All Star Industries, Inc. (hereinafter referred to as "Industries"), and Airglide, Inc. (hereinafter referred to as "Airglide") are actual defendants in the case. Defendant Horace Lowder, either solely or together with his wife, owns all of the stock in the latter three corporations. None of the plaintiffs is a shareholder of record of the latter three corporations.

Plaintiffs sought damages and other relief on the grounds that "the defendant W. Horace Lowder has engaged in an unlawful course of conduct in willful and gross abuse of his authority and discretion as the chief executive officer and as director of said companies, and in violation of his fiduciary and prudent manage-

ment obligations to the companies and their shareholders." Plaintiffs specifically requested that a receiver be appointed to preserve and manage the corporate assets of defendants pending a trial on the merits, and that an injunction issue against defendant Horace Lowder.

Defendants were ordered to appear and show cause why plaintiffs' application for appointment of a receiver pending trial on the merits should not be granted. The case was heard beginning 22 January 1979 before Judge Seay who, by order dated 2 February 1979, enjoined all of the defendants from conveying any assets of the defendants, except Carolina Feed Mills, Inc., pending further order of the court. On 9 February 1979, after receiving affidavits, hearing testimony and arguments of counsel, and reviewing the record, Judge Seay filed findings of fact which included the following:

5. Malcolm M. Lowder is and at all times material to this suit has been the record holder of more than 5% of the issued and outstanding shares of Mills, Farms, and Consolidated, and of 2.6% of the issued and outstanding shares of Carolina. Through his ownership of Mills stock, Malcolm M. Lowder is and at all times material to this suit has been the owner of beneficial interest in the shares of Foods.

6. Mark T. Lowder and Dean A. Lowder are and have been at all times material to this suit the record holders of 13 and 14 shares, respectively, in Mills. Through their ownership of Mills stock, Mark T. Lowder and Dean A. Lowder are and have been at all times material to this suit the owners of beneficial interest in the shares of Farms and Foods.

7. All of the corporate defendants collectively constitute one integrated business enterprise, which has been run solely and exclusively at the direction of W. Horace Lowder, since about 1960.

8. The principal business activities of the various corporate defendants at the present time are as follows:

*Mills* - Formerly Southern Flour Mills, Inc., the origi-

nal Lowder family company. The company was engaged in the business of milling and selling flour, cornmeal and cattle, hog, poultry and dog feed, and selling poultry supplies. It used to supply Foods, Farms and Hatcheries with cattle and poultry feed and other requirements. Now, it only leases assets to other parts of the family enterprise.

*Foods* - The company produces and sells eggs commercially. It operates all of the feed business formerly conducted by Mills. It leases poultry houses from Farms, and chickens from hatcheries. It also operates the cattle business formerly conducted by Farms.

*Hatcheries* - This company hatches and grows out chicks until twenty to twenty-two weeks old after which it leases them to Foods. The company obtains feed and poultry supplies from Foods and leases poultry houses from Consolidated.

*Farms* - Farms used to raise beef cattle for commercial sales. Now it merely leases land and poultry houses to other parts of the family enterprise.

*Carolina* - The company produces and sells livestock, hog and poultry feed in South Carolina and raises beef cattle in South Carolina for commercial sales.

*Consolidated* - Consolidated owns a cattle farm and poultry houses, all of which are leased to other parts of the family enterprise.

*Industries* - Industries finances real estate purchases by Foods, and other family companies, with money borrowed from family companies.

*Airglide* - The company owns the Lowder family enterprise's airplane.

\* \* \*

10. Defendant W. Horace Lowder has at all times material to this suit exercised sole managment responsibility for the business affairs of all the corporate defendants and has excluded plaintiff and other shareholders of said

companies from participation in their management.

The trial court found that defendant Horace Lowder had "engaged in an unlawful course of conduct" and had violated his fiduciary obligations to the corporate defendants and their shareholders. The findings of fact specifically outlined the specific acts of unlawful conduct and breach of fiduciary duty, including, *inter alia,* convictions for violation of federal tax laws, involvement in pending tax litigation, conversion of corporate assets to his own use, issuance of corporate stock to his own benefit in violation of shareholders' preemptive rights, failure to convene meetings of shareholders or directors, and failure to keep corporate records as required by law. The court further found that there was "an imminent danger of insolvency to the corporate defendants," and that "[t]he appointment of a Receiver for defendant corporations is necessary to preserve and prevent further depletion of their assets, and to prevent further unlawful acts of W. Horace Lowder." Based upon his findings, the court concluded that:

4. The requirements for the appointment of a Receiver set out in NCGS Sec. 1-502, and 1-507.1, have been met.

5. Plaintiffs have shown entitlement to the appointment of a Receiver, and to preliminary injunctive relief against W. Horace Lowder.

\* \* \*

7. It is necessary, in the aid of the court's jurisdiction, and in order to accomplish the purpose of the statutes set out above, to appoint a Receiver to manage the assets of the corporate defendants, and to enjoin defendant W. Horace Lowder from continuing to manage the corporate defendants, or to take any action on their behalf.

The court entered an order, dated 5 February 1979 and filed on 9 February 1979, appointing receivers and ordering defendant Horace Lowder, *inter alia,* to cooperate with the receivers, to provide copies of his personal federal income tax returns, and to provide to plaintiffs a schedule of all of his assets. Defendant Horace Lowder was enjoined from managing in any way the business of any of the corporate defendants, from exercising any control over them,

and from interfering in any way with the authority of the receivers.

Upon reports by the receivers that defendant Horace Lowder was not obeying the preliminary injunction, the trial judge entered an order, dated 12 February 1979, modifying the injunction in certain particulars and further ordering defendant Horace Lowder to appear and show cause why he should not be held in contempt.

On 14 February 1979, Judge Seay entered a supplemental receivership order further defining the duties of the receivers and authorizing the receivers to employ the accounting firm of Coopers & Lybrand, and the law firm of Moore and Van Allen. The court also appointed Richard Lane Brown, III, and Arent, Fox, Kintner, Plotkin, and Kahn as special tax counsel to the receivers.

On 19 February 1979, defendants moved to alter and amend the findings of fact and conclusions of law and preliminary injunction and order appointing a receiver under Rule 59 of the Rules of Civil Procedure. In an affidavit dated 20 February 1979, John M. Bahner, Jr., one of the court-appointed receivers, attested to acts of defendant Horace Lowder in violation of the previous orders and injunction. On 21 February 1979, a hearing was held before Judge Seay on the order to Horace Lowder to show cause why he should not be held in contempt. An order was entered adjudging Horace Lowder to be in civil contempt and opportunity was afforded for Horace Lowder to purge himself by compliance with the previous orders. Defendants excepted and gave notice of appeal in open court. This constitutes appeal number 67.

Defendant Horace Lowder failed to comply with the portions of the earlier orders in that he refused, on fifth amendment grounds, to produce his federal income tax returns and a listing of all of his assets. In a hearing on 28 February 1979, Judge Seay ruled that the fifth amendment privilege against self-incrimination did not apply and found Horace Lowder to be in willful disobedience of a court order. Defendant was ordered imprisoned for a five-day period and ordered to pay a fine of $500.00. Judge Seay subsequently amended the order to delete the imprisonment and impose a continuing fine of $250.00 per day until defendant purged himself.

On 5 March 1979, defendants gave notice of appeal from the 9 February 1979 order appointing a receiver and granting an injunc-

tion. This appeal eventually became a part of case number 112.

In April, 1979, the corporate defendants filed for protection under Chapter XI of the United States Bankruptcy Act. The State court proceedings were automatically stayed and jurisdiction was not returned until February, 1980. In the interim, on 26 June 1979, Judge Seay entered an order on his own motion purporting to retain jurisdiction of all matters pending in the litigation notwithstanding his rotation from the Twentieth District. Defendants excepted and subsequently moved to vacate the order. Defendants ultimately petitioned the Court of Appeals for a writ of mandamus directing the superior court judges assigned to the Twentieth District to hear motions and other matters in the case. The petition was denied.

On 4 March 1980, the Court of Appeals, in an opinion by Judge Erwin, Judges Clark and Arnold concurring, reversed the order adjudging defendant Horace Lowder to be in contempt. We allowed plaintiffs' petition for discretionary review on 16 July 1980.

On 19 April 1979, and again on 10 March 1980, the receivers petitioned the trial court for an order authorizing the payment of fees to the attorneys and accountants appointed by the court to assist in the case. By order dated 30 April 1980, Judge Seay, sitting in the Nineteenth Judicial District, scheduled a hearing on the petition for fees. The matter of fees was heard before Judge Seay at Rowan County Courthouse in Salisbury, North Carolina, on 9 May 1980. Defendants objected and excepted on the grounds that Judge Seay lacked jurisdiction to order payment of the fees. Upon his overruling the objection, defendants gave notice of appeal. On 15 May 1980, Judge Seay ordered the payment of fees to the attorneys, accountants, and receivers, and further ordered that the receivers do "whatever is necessary, and take whatever steps they deem appropriate, without further order of the Court, to sell assets of the corporate defendants, whether real or personal, in order to make payment in accordance with this Order."

Defendants did not give notice of appeal on the issue of the propriety of the initial order appointing a receiver until 5 March 1979 in violation of Rule 12 of the Rules of Appellate Procedure. In their brief to the Court of Appeals, defendants petitioned for a writ of certiorari on that issue. We allowed defendants' petition for discretionary review prior to decision of the Court of Appeals on 15

August 1980.

*Moore & Van Allen, by John T. Allred and Jeffrey J. Davis, for plaintiffs.*

*Delaney, Millette, Dearmon and McKnight, P.A., by Ernest S. Delaney, for defendants.*

*BRANCH, Chief Justice.*

[1] Defendants first contend that the initial order appointing operating receivers was void. They maintain that the statutory authorization for appointing an operating receiver for a corporation requires a finding that the corporation is either insolvent or "is in imminent danger of insolvency." G.S. 1-507.1. They concede that Finding of Fact Number 28 states specifically that "the corporate defendants are in imminent danger of becoming insolvent." However, they argue that there are no findings to support "this naked assertion." We disagree.

Statutory authority for the appointment of receivers of corporations is found in G.S. 1-507.1 which provides:

> When a corporation becomes insolvent or suspends its ordinary business for want of funds or it is in imminent danger of insolvency . . . a receiver may be appointed by the court under the same regulations that are provided by law for the appointment of receivers in other cases.

The trial court found, *inter alia,* as follows:

(a) Defendant W. Horace Lowder has converted assets of Lowder Farms, Inc., to his own beneficial use.

(b) Defendant W. Horace Lowder has converted assets of All Star Foods to his own beneficial use.

(c) The companies' Federal income tax affairs were so improperly managed by Defendant Lowder that in 1973

he was convicted by a jury in the United States District Court for the Middle District of North Carolina on one count of conspiracy to defraud the United States by obstructing the Internal Revenue Service in its task of computing and collecting revenue, by concealing the nature, extent and treatment of inter-corporate sales, purchases and transfers among the family corporations and secreting, destroying or refusing to produce supporting documents and records relating to such inter-corporate transactions (all in violation of 18 U.S.C. Sec. 371), and on two counts of knowingly filing false corporate income tax returns (all in violation of 26 U.S.C. Sec. 7206 (1)). Six of the Lowder family companies - Mills, Farms, Foods, Hatcheries, Industries and Consolidated - were indicted under the conspiracy count but the criminal charges against them were subsequently dismissed voluntarily by the government, prior to trial. On appeal defendant Lowder's convictions were upheld (*United States v. Lowder* 492 F 2d 953 (4th Cir. 1974)) and *certiorari* was denied (419 U.S. 1092 (1974)). Defendant Lowder was fined $20,000 and sentenced to two years of imprisonment on each of the three counts (concurrent) and he actually served over one year until his parole in 1976. Said defendant continued his exclusive operational control and management of the companies while he was in prison. Defendant Lowder appeared *pro se* in the District Court criminal trial, and handled his appeal to the 4th Circuit Court of Appeals *pro se* as well.

(d) In addition to the criminal charges described above, civil tax deficiencies and assessments were made by the IRS against defendant Lowder, his father's estate, and against Mills, Farms, Hatcheries, Foods and Carolina for various tax years from 1950 through 1972. The aggregate amount of these claims against the five companies is $4,712,651.00 exclusive of penalties and interest (which could bring the total liability to almost $10 million) and also exclusive of such state income tax liabilities as may become due and payable after federal tax liabilities have been fully determined. Attached hereto as Exhibit B and incorporated by reference is a list of the pending United States Tax Court cases indicating the amounts claimed

from the defendants in those cases and the tax years in question. These civil cases were continued from the time that defendant was indicted, until he completed serving his term in prison. In April, 1978, the cases were consolidated for trial and the trial was commenced. Defendant Lowder, *pro se*, is representing himself, his father's estate and the five defendant companies. The trial is in recess until February 20, 1979. Defendant Lowder has failed and refused to retain legal counsel and accounting assistance in the defense of such cases notwithstanding that the original petitions were filed by competent counsel, Fleming, Robinson and Bradshaw, of Charlotte, and notwithstanding (i) the repeated urgings of the Tax Court judge and government counsel that he do so, and (ii) repeated warnings by such judge and counsel that his failure to do so is likely to substantially increase the tax liability which said companies will suffer. Defendant Lowder is not an attorney or otherwise experienced in tax or general litigation and has had no formal training which would equip him for the defense of the pending litigation against five of the Lowder family companies. The IRS investigation of the All Star group companies is continuing at the present time and further tax deficiencies and assessments may be asserted.

(e) Beginning in 1971 with his Federal grand jury indictment and continuing through the present, defendant W. Horace Lowder has grossly neglected his duties as manager of the Lowder family companies and has devoted his energies to his personal tax problems and to the tax problems of the Lowder family companies resulting from his management, all to the financial detriment of the Lowder family companies.

(f) Defendant Lowder has converted funds and other assets of Mills, Farms and their subsidiary and affiliated companies to his own beneficial use, has unlawfully transferred assets of such companies to other corporations, all the shares of which are issued to him, has diverted business opportunities from such companies to himself or to the corporations owned by him and has caused and permitted such companies to make unlawful loans to himself

or to other corporations owned by him, all without the knowledge or consent of the other stockholders.

(g) Defendant Lowder has caused and permitted corporate stock of Mills and Farms to be unlawfully issued to himself, for his use and benefit, in disregard and violation of the preemptive rights of the plaintiffs and other stockholders; two such instances having occurred on October 23, 1978, when said defendant caused 1435 shares of Mills and 460 shares of Farms to be issued to himself.

(h) Defendant Lowder has unlawfully managed and operated Mills, Farms and their subsidiary and affiliated companies by failing and refusing to convene meetings of shareholders or directors of said companies. He admitted in this case that there have been no shareholder meetings for any of the corporate defendants since 1958.

(i) Defendant Lowder has unlawfully failed and refused to keep the corporate and business records and minutes required by law and has failed and refused to advise the shareholders of the condition of the several businesses.

(j) (i) On October 20, 1978, in accordance with NC GS Sec 55-38, plaintiff Malcolm M. Lowder made written demand upon defendant W. Horace Lowder for the production of the following documents of Mills, Farms and Consolidated for examination by said plaintiff at the principal office of said corporation:

(a) The books and records of account,

(b) The minutes of the stockholders' and directors meetings,

(c) The stock certificate books, and

(d) The corporate income tax returns for all fiscal years subsequent to 1952.

(ii) In response to this lawful demand defendant W.

Horace Lowder (a) advised plaintiff Malcolm M. Lowder that he could resign from his position with Foods if he did not like the way said defendant was operating the family enterprise, and (b) furnished said plaintiff with the first and last pages of what appear to be the Federal income tax returns of the three corporations for the ten years since 1968 and with a typed list of the shareholders of the three corporations.

(iii) On November 9, 1978, plaintiff Malcolm M. Lowder made a second written demand upon defendant W. Horace Lowder advising him of the insufficiency of the documents produced, enclosing a copy of NC GS Sec 55-38 and reiterating his demand for the documents.

(iv) In response to this second demand the defendant W. Horace Lowder advised plaintiff Malcolm M. Lowder that said defendant believes he "had satisfied the purpose of your request of October 20th."

(k) W. Horace Lowder unlawfully discharged Malcolm Lowder from his duties with All Star Foods, Inc., in retaliation for the institution of this lawsuit.

(l) W. Horace Lowder has admitted borrowing large sums of money from several of the corporations, and these transactions were never approved by the shareholders or the directors, as required by NC GS Sec 55-22 and 55-30.

(m) Horace Lowder has admitted transferring the egg production of Lowder Farms, of which he owns 12%, to All Star Foods, of which he owns 51%, *without considera-tion*. This transfer resulted in a decline of Lowder Farms gross income from $1,800,000 to about $50,000 in the course of one year.

(n) During the period of time when this transfer was occurring, the net worth of Lowder Farms decreased by $69,000 and the net worth of All Star Foods increased by $465,000.

(o) Horace Lowder admitted having borrowed, on numerous occasions, from *all* of the corporate defendants, at one time or another, and admitted that All Star Hatcheries, which is owned wholly by him and his wife, had also borrowed from the other defendants.

(p) Horace Lowder also purchased 3,800 acres of land in Beaufort County, North Carolina, and various tracts in Stanly County, North Carolina, personally rather than on behalf of the corporations. Most, if not all, of these purchases were financed with corporate funds.

(q) He admitted that All Star Foods purchased 15,000 acres of land in Hyde County, North Carolina with money borrowed from All Star Industries, which he owns wholly. All Star Industries had borrowed the money from Horace Lowder personally, who in turn had borrowed it from All Star Mills, All Star Hatcheries, All Star Foods, and Lowder Farms. (Thus, the Hyde County property was purchased with these companies' money.)

(r) He admitted that this transaction resulted in a *net* interest income to him personally of $\frac{1}{4}$ of 1% of the principal outstanding, and that All Star Industries also received a net interest income of $\frac{1}{4}$ of 1%. Since he owns 100% of the shares of All Star Industries, the net result of the transaction, is that Horace Lowder makes $\frac{1}{2}$ of 1% in interest on money loaned by All Star Foods, through him, to itself.

(s) None of the defendant companies has ever paid a dividend to any shareholder since Horace Lowder took over control of the companies, except that the I.R.S. contends that one of Horace Lowder's transactions with the companies has resulted in a constructive dividend to him personally of approximately $500,000.

* * *

16. In addition to the unlawful conduct described above, W. Horace Lowder has breached his fiduciary duties, and duties to prudently manage the business of the companies, in the following ways:

(a) Prior to 1960, Malcolm Lowder had received several

dividends on his stock in All Star Mills. In 1960 he received one dividend on his stock in Lowder Farms. Since 1960 he has not received any dividends from any of the companies in which he holds stock.

(b) The physical assets of Mills, Farms and their subsidiary and affiliated companies have been grossly neglected by the defendant Lowder for the past several years and continuing to the present time. Said defendant has failed and refused to repair or replace said assets so that at the present time most of the companies' business operations are being conducted with worn out, obsolete and otherwise inadequate equipment.

(c) In the Tax Court cases, the assets of the companies have been, and are continuing to be recklessly subjected to the risk of loss of millions of dollars over and above the amounts of federal tax liabilities which the company should reasonably expect to pay if defended by competent, legal and accounting professionals, rather than *pro se* by W. Horace Lowder.

* * *

20. If competent legal and accounting counsel is not retained for the companies for the tax court cases currently pending, there is a substantial and immediate risk that the companies will be irreparably harmed, by imposition of liabilities of millions of dollars in federal taxes.

21. This risk of loss creates an imminent danger of insolvency to the corporate defendants.

22. If W. Horace Lowder is allowed to retain control of the corporate defendants, and a receiver is not appointed, the corporate defendants may suffer irreparable harm, in that:

(a) Assets of the companies may continue to be converted to W. Horace Lowder's own beneficial use.

(b) Assets of the companies will be exposed to loss as a result of the Tax Court proceedings.

(c) Corporate financial, business, and other records required by law may not be kept.

(d) There will be a continual loss of revenues.

(e) The reputation and good will of the companies will be further injured.

(f) Plaintiffs will continue to be deprived of their pre-emptive rights to buy corporate stocks.

(g) The stockholdings of plaintiffs' will be unlawfully diluted.

(h) Plaintiffs will continue to be denied access to information about defendant companies to which they are entitled.

(i) Plaintiffs will continue to be deprived of any opportunity to elect directors and otherwise exercise and enjoy their rights as stockholders.

23. Defendant W. Horace Lowder's course of conduct is continuing and will continue so long as defendant has managerial control of the Lowder family companies.

24. Plaintiffs have no adequate remedy at law to prevent such continuing mismanagement, waste of assets and loss of revenues.

* * *

27. The appointment of a Receiver for defendant corporations is necessary to preserve and prevent further depletion of their assets, and to prevent further unlawful acts of W. Horace Lowder, as described above.

28. Because of the facts described above, the corporate defendants are in imminent danger of becoming insolvent.

The extensive findings by the trial court amply support the findings and conclusion that these corporations are in imminent danger of insolvency.

Furthermore, even if the findings did not support a determination that insolvency was imminent within the purview of the statute, it is elementary that a Court of Equity has the inherent power to appoint a receiver, notwithstanding specific statutory authorization. *Skinner v. Maxwell*, 66 N.C. 45 (1872).

The appointment of receivers is one of the oldest remedies

known to chancery, *Blum Bros. v. Girard Nat. Bank*, 248 Pa. 148, 93 A. 940 (1915), and one of the most common instances in which a receiver may be appointed is where it is necessary "to preserve, *pendente lite*, specific property which is the subject of litigation." *Sinclair v. Moore Central Railroad Co.*, 228 N.C. 389, 395, 45 S.E. 2d 555, 560 (1947). The remedy is considered a harsh one and should be utilized only with attendant "caution and circumspection." 65 Am. Jur. 2d "Receivers" §27 (1972). There should be fraud or "imminent danger of the property being lost, injured, diminished in value, destroyed, squandered, wasted, or removed from the jurisdiction." *Id.*

Appointing a receiver for a going, solvent corporation is an especially rare and drastic remedy. *Id.* §§ 59, 60. However, it has been found to constitute a proper remedy in cases where there is fraud or gross misconduct in the management of the corporation., *Id.* §§ 64, 66; where there is incapacity or neglect on the part of those operating it, *Id.* § 60; where there is evidence of diversion of corporate funds, *Hall v. Nieukirk*, 12 Idaho 33, 85 P. 485 (1906); and even where there is a refusal to permit inspection of corporate books, at least when such a refusal occurs in combination with the existence of other grounds. *Baille v. Columbia Gold Mining Co.*, 86 Or 1, 166 P. 965 (1917) (subsequent history deleted).

We hold that even if the corporate defendants were not in imminent danger of insolvency within the purview of G.S. 1-507.1, the findings of fact support numerous other grounds for the appointment of receivers by the trial court in the exercise of its inherent equitable powers, and that the appointment of the receivers in the instant case was without error.

[2] Even so, defendants contend that the initial order was void because certain shareholders were not given notice of the proceedings to secure the appointment of the receivers. Defendants argue that these shareholders were denied their due process rights to notice prior to a court proceeding, the outcome of which would affect their property interests. Assuming, *arguendo*, that the corporate defendants have standing to assert the constitutional rights of third persons, we nevertheless find no error. There is no requirement in the statutes, either in the provisions governing the appointment of receivers, G.S. 1-502, 1-507 *et. seq.*, or in the provisions governing derivative shareholder suits, G.S. 55-55, that notice be given to persons who are not parties to the action. Furthermore, the

allegedly aggrieved shareholders moved, prior to the initial hearing on plaintiffs' application for appointment of a receiver, to dismiss the application, and noted specifically that they had received and read a copy of plaintiffs' complaint. Such action on the part of the shareholders admits of actual prior notice of the proceedings and amounts to a waiver of error, if one exists, in the failure of the plaintiffs to give notice. *Grieve v. Huber,* 38 Wyo. 223, 266 P. 128 (1928). We, therefore, hold that the trial court's order appointing receivers is not void for failure to notify third persons of the proceedings.

**[3]** Defendants next maintain that the trial judge erred in reserving jurisdiction of the cause in himself, and that all orders entered by him after his rotation out of the Twentieth Judicial District are void for lack of jurisdiction. The record in this case indicates that while federal bankruptcy proceedings were pending, Judge Seay entered an order retaining jurisdiction in himself of all matters in this action, notwithstanding his rotation out of the Twentieth District. Subsequently, after jurisdiction of the case was returned to state court, Judge Seay, sitting in District Nineteen-A, entered orders approving payment of certain fees to attorneys and accountants. Defendants now contend that Judge Seay lacked authority to reserve jurisdiction in himself.

The resolution of this issue turns on the effective date of the following amendment to G.S. 1-501:

Any resident judge of the Superior Court Division or any nonresident judge of the Superior Court Division assigned to a district who appoints receivers pursuant to the authority granted [in this section] while holding court in that district may, in his discretion, retain jurisdiction and supervision of the original action, of the receivers appointed therefor and of any other civil actions pending in the same district involving the receivers, following his rotation out of the district.

The amendment is found in the 1979 Session Laws, Chapter 525, section 13. The act was ratified on 8 May 1979, almost four months following the institution of this action. An examination of the relevant portions of Chapter 525 reveals the following:

Sec. 12. Section 1 of this act shall become effective January 1, 1980, and shall not apply to causes of action

arising prior to January 1, 1980. The remaining sections of this act are effective upon ratification, except they shall not affect pending litigation and Section 4 shall apply only to the administration of the estates of decedents dying on or after the effective date.

Sec. 13. G.S. 1-501 as the same appears in the 1977 Cumulative Supplement to Volume 1A (1975 Replacement) of the General Statutes is hereby amended on line 5 to add a new sentence to read as follows:

"Any resident judge of the Superior Court Division or any nonresident judge of the Superior Court Division assigned to a district who appoints receivers pursuant to the authority granted hereby while holding court in that district may, in his discretion, retain jurisdiction and supervision of the original action, of the receivers appointed therefor and of any other civil actions pending in the same district involving the receivers, following his rotation out of the district."

Sec. 14. Section 13 of this act shall become effective upon ratification.

In the General Assembly read three times and ratified, this the 8th day of May, 1979.

The question thus presented is whether section 12 governs the determination of the effective date of section 13, or whether section 14 is the applicable section for that determination. In our view, it is the latter section which controls. Where two statutory provisions appear, a special or particular provision will control over a general one. *Phillips v. Shaw*, 238 N.C. 518, 78 S.E. 2d 314 (1953). It is apparent to us that section 14 applies specifically to the preceding section, while section 12 refers to all other portions of the chapter. To hold otherwise renders section 14 applicable to *no* section and therefore mere surplusage. It cannot be presumed that the legislature intended to enact meaningless provisions. *Jackson v. Guilford County Board of Adjustment*, 275 N.C. 155, 166 S.E. 2d 78 (1969). Since the legislative grant of authority took effect, pursuant to section 14, upon ratification on 8 May 1979 and was applicable to pending actions, Judge Seay was not divested of jurisdiction for lack of statutory authority.

**[4]** Defendants contend that the trial court had no jurisdiction to

proceed in this matter after the corporate defendants gave notice of appeal from the court's overruling their objection to the court's jurisdiction. They argue that all orders entered subsequent to the notice of appeal are void. Plaintiffs maintain that the jurisdiction of the trial court continued unhindered until the appeal was perfected. In support of this contention, they rely upon the following language in G.S. 1-294:

> When an appeal is perfected as provided by this article it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein . . . .

Plaintiffs further bolster their argument with citations to two cases, both of which support the notion that "perfection" of an appeal is something more than the mere giving of notice of appeal. *Coates v. Wilkes*, 94 N.C. 174 (1885); *Wilson v. Seagle*, 84 N.C. 110 (1880). As the Court stated in *Coates v. Wilkes, supra,* "It is settled that the order appealed from did not pass out of the jurisdiction and beyond the control of the Court, until the appeal was perfected." *Id.* at 178.

The well-established rule of law is that "an appeal from a judgment rendered in the Superior Court suspends all further proceedings in the cause in that court, pending the appeal." *Harris v. Fairly*, 232 N.C. 555, 556, 61 S.E. 2d 619, 620 (1950). It is also well settled that an appeal, even of an interlocutory order, "operates as a stay of all proceedings in the Superior Court relating to issues included therein until the matters are determined in the Supreme Court." *Veazey v. City of Durham*, 231 N.C. 357, 363, 57 S.E. 2d 377, 382 (1950); *Combes v. Adams*, 150 N.C. 64, 63 S.E. 186 (1908). While we agree with plaintiffs that "perfecting" an appeal means more than merely giving notice of appeal, we have held that the perfection, or docketing, of an appeal "relates back to the time of trial; [and] operates as a stay of proceedings within the meaning of the statute, and brings the . . . cause within the principle of the cases which hold that the court below is without power to hear and determine questions involved in an appeal pending in the Supreme Court." *Pruett v. Power Co.*, 167 N.C. 598, 600, 83 S.E. 830, 831 (1914).

Plaintiff's reliance, therefore, on *Coates v. Wilkes, supra,* and *Wilson v. Seagle, supra,* is misplaced. In both of these cases, the appealing party gave notice of appeal and then allowed the time for perfecting the appeal to elapse. Upon the trial court's proceeding further to determine matters, the appealing party objected on the

grounds that the taking of the appeal removed the case from the jurisdiction of the trial court, and hence any subsequent proceedings would be void. This Court in essence held in both cases that the appealing party "did not *take* an appeal within the meaning of the statute, and that by his laches and subsequent conduct, he has lost the right, now, to do so." *Wilson v. Seagle, supra,* at 114. Similarly, the Court in *Pruett v. Power Co., supra,* observed,

> In various cases where the construction of [G.S. 1-294] was directly or indirectly involved, the Court has held that an appeal is not to be considered as perfected until it is duly docketed in the Supreme Court; but in all of them, so far as examined, the questions presented were either on the right of this Court to take cognizance of some matter embraced in the appeal before docketing the record or the time within which the appellant had the right to docket had expired, and the parties were allowed to proceed in the court below on the idea that the appeal had been either temporarily or finally abandoned or there was some omission or laches on the part of the appellant which were considered as a waiver of his rights in the premises.

*Id.* at 599, 83 S.E. at 831.

In the instant case, defendants excepted and gave oral notice of appeal on 9 May 1980 from Judge Seay's overruling their objections to the court's jurisdiction to hear matters outside the Twentieth Judicial District. The ruling of the trial court affected a substantial right of defendants and was therefore appealable. G.S. 1-277; *Steele v. Moore-Flesher Hauling Co.,* 260 N.C. 486, 133 S.E. 2d 197 (1963); *Veazey v. City of Durham, supra; Martin v. Flippin,* 101 N.C. 452, 8 S.E. 345 (1888). Since defendants' subsequent perfection of the appeal related back to the time of the giving of notice of appeal, all orders entered by Judge Seay after defendants' notice of appeal on 9 May 1980 are void for want of jurisdiction. Thus the orders entered 15 May 1980 approving the payment of fees and expenses in this case must be vacated.

We turn then to the assignments of error having to do with the contempt phase of the hearing.

Our consideration of the trial court's handling of the contempt matter requires three inquiries. First, we must determine whether the contempt proceedings are properly before us for review. Second,

Lowder v. Mills, Inc.

we must consider whether we are dealing with criminal or civil contempt to determine whether the proper procedure was applied. Third, we must determine whether there is sufficient evidence to support a finding of contempt.

[5] On the first point, defendant contends that his oral notice of appeal of the 21 February contempt order ousted jurisdiction from the trial court as to any further contempt proceedings in the same matter. Plaintiff argues that jurisdiction was not lost until the appeal was properly perfected, and that the order entered at the 28 February hearing imposing sanctions is valid.

In *Willis v. Duke Power Company*, 291 N.C. 19, 229 S.E. 2d 191 (1976), we held that a contempt order to compel the production of documents under the discovery provision of the Rules of Civil Procedure could be appealed upon entry even though sanctions were not imposed. Here the requirement to produce documents, though not under the Rules of Civil Procedure, is so factually similar that we find *Willis* to be controlling. As we noted above, perfection of an appeal relates back to the taking of the appeal, and the jurisdiction of the trial court is divested from the date that notice of appeal was given. *Veazy v. City of Durham, supra.* We, therefore, hold that when oral notice of the appeal was given in open court on 21 February, the court lost jurisdiction to take further action on the contempt matter. The trial court's order imposing a sanction which is based on the second contempt hearing is null and void.

With only the 21 February hearing before us, we turn to the question of the characterization of the contempt.

[6] In the context of compelled production of documents, a contempt order has been characterized as an amalgam of civil and criminal contempt. *Willis v. Duke Power Company, supra.* Although this characterization occurred before passage of the new contempt statutes, those statutes continue to recognize that the same act can constitute both civil and criminal contempt. G.S. 5A-21(c). G.S. 5A-21 provides that "[f]ailure to comply with an order of a court is a continuing civil contempt." Similarly, G.S. 5A-11(3) provides that "[w]ilful disobedience of, resistance to, or interference with a court's lawful process, order, directive, or instruction or its execution" constitutes criminal contempt. Since the contempt proceeding in this case can rest on either the criminal or civil foundations, we conclude that compliance with either the procedural requirements

of civil contempt or criminal contempt will validate the pro-
ceedings.

We first consider the procedural requirements of civil con-
tempt. The Court of Appeals decided that the court can only issue a
civil contempt show cause order on the basis of a sworn statement or
affidavit. G.S. 5A-23. It then decided that, since it could find no
evidence in the record of sworn statement or affidavit prior to the 12
February issuance of the show cause order, it could not uphold the
proceeding as one for civil contempt.

The Court of Appeals' analysis of the new statute is correct.
However, when the contemnor came into court to answer the
charges of the show cause order, he waived procedural require-
ments. *Safie Manufacturing Company v. Arnold,* 228 N.C. 375, 45
S.E. 2d 577 (1947); *In re Odum,* 133 N.C. 250, 45 S.E. 569 (1903).

Finally, we come to the question of the sufficiency of the
evidence to support the contempt order. As the Court of Appeals
noted, the contempt order can only be upheld on either of two
evidentiary bases: (1) the Bahner affidavit or (2) the admission of
defendant's counsel in open court that defendant would defy the
order of the court to turn over his personal income tax returns[1] by
asserting his fifth amendment privilege against self-incrimination.

[7]  The Court of Appeals correctly dealt with the first of these
bases. It recognized that the North Carolina Constitution as well as
the Federal Constitution preserve the right of confrontation of the
witnesses against an accused and that this right is applicable to
contempt proceedings. *Cotton Mills v. Local 578,* 251 N.C. 218, 111
S.E. 2d 457 (1959), *cert. denied,* 362 U.S. 941, 80 S.Ct. 806, 4 L.Ed.
2d 770 (1960). The Court of Appeals found that defendant in this
case had made a timely assertion of the right. Thus, reliance on the
affidavit cannot support a finding of contempt.

[8]  There remains the question of whether defendant's refusal to
comply with the court's order to produce tax returns was protected

---

[1]Defendant only asserted his right against self-incrimination as to the tax
returns at the 2 February hearing. He later asserted the privilege as to other
material in the second hearing. Only the assertion of the privilege covering the tax
returns is properly before this Court.

by the fifth amendment proscription against compulsory self-incrimination.

The fifth amendment to the Unites States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." Although the fifth amendment privilege against compulsory testimonial self-incrimination is ordinarily asserted in criminal proceedings, its protection also extends to civil proceedings where a party may be subjected to imprisonment. *McCarthy v. Arndstein*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924); *Allred v. Graves*, 261 N. C. 31, 134 S.E. 2d 186 (1964).

Both the state and federal courts have long recognized and applied the important constitutional prohibition against compulsory testimonial self-incrimination. *Couch v. United States*, 409 U.S. 322, 34 L.Ed. 2d 548, 93 S.Ct. 611 (1973); *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966); *Malloy v. Hogan*, 378 U.S. 1, 12 L.Ed. 2d 653, 84 S.Ct. 1489 (1964); *Counselman v. Hitchcock*, 142 U.S. 547 35 L.Ed. 1110, 12 S.Ct. 195 (1892). This consitutional provision grew out of our abhorrence of and desire that there be no "recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality." *Ullmann v. United States*, 350 U.S. 422, 428, 100 L.Ed. 511, 519, 76 S.Ct. 497, 501 (1956).

Many of the earlier cases which considered the fifth amendment prohibition against compelled testimonial incrimination contained language to the effect that the purpose of the amendment was to protect personal privacy. *Couch v. United States, supra; Murphy v. Waterfront Commission*, 378 U.S. 52, 12 L.Ed. 2d 678, 84 S.C. 1594 (1964); *Davis v. United States*, 328 U.S. 582, 90 L.Ed. 1453, 66 S.Ct. 1256 (1946); *Wilson v. United States*, 221 U.S. 361, 55 L.Ed. 771, 31 S.Ct. 538 (1911); *Boyd v. United States*, 116 U.S. 616, 29 L.Ed. 746, 6 S.Ct. 524 (1886). This rational was first set out in *Boyd v. United States, supra.* As the Court said in that case, "The principles laid down in this opinion affect the very essence of constitutional liberty and security . . . . [T]hey apply to all invasions, on the part of the government and its employees, of the sanctity of a man's home and the privacies of life." *Id.* at 630, 29 L.Ed. at 749, 6 S.Ct. at 532.

We find similar language in *Couch*, but there the Court more narrowly focused on the requirements that there must be compelled testimonial self-incrimination before the fifth amendment

protections are triggered.

In *Couch* the Internal Revenue Service issued a subpoena duces tecum to Couch's independent acountant to produce records which had been delivered over a number of years to the accountant for his preparation of Couch's income tax returns. Couch unsuccessfully invoked his fifth amendment right against self-incrimination in the United States District Court of Virginia, and the Fourth Circuit Court of Appeals affirmed. The United States Supreme Court allowed petition for certiorari. In affirming the lower courts, the Supreme Court, emphasizing the fact that the subpoena was directed to petitioner's independent accountant rather than to petitioner, in part, stated:

> It is important to reiterate that the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to information that may incriminate him. As Mr. Justice Holmes put it: "A party is privileged from producing the evidence but not from its production." *Johnson v. United States*, 228 U.S. 457, 458, 57 L.Ed. 919, 33 S.Ct. 572 (1913). The Constitution explicitly prohibits compelling an accused to bear witness "against himself": it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege, and "prohibition of compelling a man . . . to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from *him*," *Holt v. United States*, 218 U.S. 245, 252-253, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910) (emphasis added). It is extortion of information from the accused himself that offends our sense of justice.

* * *

> The divulgence of potentially incriminating evidence against petitioner is naturally unwelcome. But petitioner's distress would be no less if the divulgence came not from her accountant but from some other third party with whom she was connected and who possessed substantially equivalent knowledge of her business affairs. The basis complaint of petitioner stems from the fact of divulgence of the possibly incriminating information, not from the manner in which or the person from whom it

was extracted. Yet such divulgence, where it did not coerce the accused herself, is a necessary part of the process of law enforcement and tax investigation.

*Id.* at 328-29, 34 L.Ed. 2d at 554-55, 93 S.Ct. at 616.

*Couch* was followed by *Garner v. United States*, 424 U.S. 648, 47 L.Ed. 2d 370, 96 S.Ct. 1178 (1976). There defendant was charged with conspiracy to violate federal gambling statutes. At trial the government, over defendant's fifth amendment objection, was permitted to introduce his income tax returns in which defendant had reported his occupation as "professional gambler." Defendant was convicted, and the Ninth Circuit Court of Apeals affirmed on the ground that defendant failed to timely assert his fifth amendment privilege. The Supreme Court affirmed, reasoning that the disclosures were made at the time the documents were prepared and were not at that time *compelled* by the government. Since defendant did not timely claim his fifth amendment privilege, it was in effect waived. This was so even though defendant might have been subjected to prosecution for willful failure to file a return or was subject to be summoned to testify or produce records pursuant to 26 U.S.C. Section 7602(2). In reaching its decision, the Court noted that the scope of the fifth amendment is narrowly restricted to matters in which the government seeks testimony which will subject the giver to imprisonment.

*Fisher v. United States*, 425 U.S. 391, 48 L.Ed. 2d 39, 96 S.Ct. 1569 (1976), involved two cases consolidated on appeal in which the government had subpoenaed tax returns and tax records in the hands of the defendants' attorneys. Case No. 74-611 involved the defendant's tax returns and involved work papers and correspondence relative to the defendant's returns. The subpoena in Case No. 74-18 was directed to documents containing analyses by the accountant of the taxpayer's income and expenses as derived from checks and deposit slips. The Fifth Circuit Court of Appeals reversed the enforcement of the order in Case No. 74-611, and the Third Circuit affirmed the enforcement order in Case No. 74-18. The Supreme Court granted certiorari and affirmed in Case No. 74-18 and reversed in Case No. 74-611. In so holding, the Court clearly limited the individual privacy claim under the fifth amendment to those cases which involved *compelled testimonial incrimination.*

After deciding in Case No. 74-18 that the documents in the hands of the defendant's lawyers were not protected by the attorney-

client privilege unless the defendant himself could have asserted
the fifth amendment privilege, the Court turned to a consideration
of the elements necessary to raise fifth amendment protection.
Although the Court found that the materials sought were testimo-
nial, it concluded that the *contents* could not activate the fifth
amendment protection because the element of *compulsion* was lack-
ing. In so finding, the Court used this language: ". . . The prepara-
tion of all of the papers sought in these cases was wholly voluntary,
and they cannot be said to contain compelled testimonial evidence
either of the taxpayers or of anyone else." *Id.* at 409, 48 L.Ed. 2d at
55, 96 S.Ct. at 1580. In other words, the Court concluded that at the
time the contents of all of the documents sought were prepared,
there was no physical or moral compulsion exerted upon the
accused or any other person who prepared the tax returns or other
documents. However, the Court recognized that the *production* of
the documents was compelled by subpoena and that compliance
with the subpoena had the communicative effect of conceding the
*existence* of the subpoenaed documents and their possession by the
taxpayer. The production would also amount to testimonial authenti-
cation of the documents by expressing the taxpayer's belief that the
papers produced were the same as those described in the subpoena.

The Court then concluded that the collateral testimony as to
the *existence* of the papers was so inconsequential that it did not rise
to the level of the fifth amendment prohibition. Turning to the
question of whether the production of the documents constituted
compelled testimony by authenticating the tax returns, the Court
reasoned that since the records were not prepared by defendant his
production of the records could not be an authentication because he
could not authenticate the work of another person. The Court there-
fore held that the required testimonial element was not met by the
production of the records and tax returns and thus the fifth amend-
ment privilege did not arise. The Court expressly reserved the
question of whether the same result would have been reached had
the taxpayer prepared his own returns.

In summary, the recent cases represented by *Fisher* and *Gar-
ner* effectively destroyed the rationale of *Boyd v. United States,
supra,* to the effect that the fifth amendment's proscription against
self-incrimination was based on the individual's right to privacy.
These later cases hold that the fifth amendment's protection is
against "compelled testimonial self-incrimination, not [the disclo-

sure of] private information." *U.S. v. Nobles*, 422 U.S. 225, 233 n. 7, 45 L.Ed. 2d 141, 151 n. 7, 95 S.Ct. 2160, 2167 n. 7 (1975). Both *Garner* and *Fisher* stand for the proposition that the *contents* of subpoenaed documents cannot support the required element of compulsion unless the physical or moral force was exerted at the time the documents were prepared thereby making their preparation involuntary. The Court in *Fisher* nevertheless recognized that the forced production of documents could involve two testimonial aspects in that (1) production is implicit testimony of the existence of the documents and (2) production can be construed as some evidence of the authenticity of the documents produced, *i.e.*, that the documents produced are the ones described in the subpoena. *Fisher v. United States, supra.*

In the case before us we find no evidence tending to show that defendant was under any physical or mental coercion at the time he prepared his tax returns. We therefore hold that defendant cannot rely upon the *contents* of the tax returns to support his claim of fifth amendment protection. *Fisher v. United States, supra; Garner v. United States, supra.*

**[9]** Finally, it is unquestioned that the production of the tax returns was compelled by the subpoena. Therefore, we turn to the question of whether the testimonial aspects of compulsory production of the tax returns support a claim of fifth amendment privilege.

Here defendant does not take the position that the returns do not exist. To the contrary, he implicitly admits the existence of the tax returns by arguing that information in the tax returns might be incriminating as a "link in the chain." However, the question of whether the production of the tax returns amounts to such authentication as to be compelled testimonial self-incrimination presents a more difficult question.

The authentication rationale "appears to be the prevailing justification for the fifth amendment's application to documentary subpoenas." *Fisher v. United States, supra* at 412, n. 12, 48 L.Ed. 2d at 57, n. 12, 96 S.Ct. at 1582, n. 12. Defendant's position relying on this rationale is supported by a rather loosely reasoned statement at § 2264 of 8 Wingmore on Evidence (McNaughton rev. 1961):

(1) It follows that the production of *documents* or *chattels* by a person (whether ordinary witness or party witness) in response to a subpoena, or to a motion to order

Lowder v. Mills, Inc.

production, or to other form of *process relying on his
moral responsibility for truthtelling*, may be refused
under the protection of the privilege. This is universally
conceded. For though the documents or chattels thus
sought be not oral in form, and though they be already in
existence and not desired to be first written and created
by a testimonial act or utterance of the person in response
to the process, still there is a testimonial disclosure
implicit in their production. It is the witness' assurance,
compelled as an incident of the process, that the articles
produced are the ones demanded. No meaningful distinc-
tion can be drawn between a communication necessarily
implied by legally compelled conduct and one authenti-
cating the articles expressly made under compulsion in
court. Testimonial acts of this sort - authenticating or
vouching for pre-existing chattels - are not typical of the
sort of disclosures which are caught in the main current
of history and sentiments giving vitality to the privilege.
Yet they are within the borders of its protection.

We are more inclined to accept Judge Friendly's criticism of
this rationale which appears in 37 U. Cin. L. Rev. 671, 701-02 (1968)
as follows:

The argument that compulsory production involves an
implicit testimonial disclosure, to wit, "the witness' assur-
ance. . .that the articles produced are the ones demanded,"
which led Wigmore to grudging acceptance of the fifth
amendment holding in *Boyd*, reeks of the oil lamp. Yet it
is only this assumed authentication that brings the case with-
in the words of the amendment "to be a witness against
himself." The prosecution wants the chattels, typically
documents; it will find its own ways for authenticating
them. The dilemma thus is not of self-accusation and
perjury but of self-accusation and refusal to respect a
court's process. It takes a heart much more hemophilic
than mine to find cruelty in this. Although the Court's
recent qualified rejection of the rule banning searches
for "mere evidence" greatly reduces the practical impor-
tance of *Boyd* with respect to ordinary chattels, the Court
declined to decide how far writings could be the subject
of a search and seizure. Whatever limits the fourth

amendment may be held to to impose on the seizure of writings, there is no justification for a similar restriction with respect to the fifth. The writings typically sought to be produced are not the outpourings of an individual's soul, for which first amendment protection against subpoena may be in order, but rather the books and records of an enterprise that is criminal or has been unlawfully conducted.

. . . While the *Boyd* decision was doubtless supported by precedent at common law, I agree with Professor Mayers' statement that: "However one looks at it, no practical reason connected with fairness of procedure can be found for this extraordinary privilege of withholding needed documentary evidence from a court." Any proper considerations can be dealt with under fourth amendment protection against dragnet subpoenas and first amendment guarantees against inquiry into improper subjects.

Tax returns are not completely private documents because they must be filed with the government. 26 U.S.C. §§ 6001, 6011, 6012. N.C.G.S. 105-154. On the other hand, the information in these returns is not completely public. We are not at this point concerned with the contents of the tax returns since we have held that under the facts of this case the contents do not activate the fifth amendment protection; however, we consider instead how the hybrid nature of the documents affects the question of implicit authentication. The federal statute, 26 U.S.C. 6103, which provides for the confidentiality of the returns is riddled with exceptions which permit an individual's tax return to be examined, *inter alia*, by the Chief of Staff of the Joint Committee on Taxation, specially authorized committees of the House of Representatives, agents of committees of the House of Representatives, the President of the United States, the Department of the Treasury, and by the Department of Justice. The statute also permits disclosures of information concerning an individual's tax returns in judicial and administrative tax proceedings.

The documents sought here are not strictly private documents such as an individual's diary or personal letters. To the contrary they are, at most, semi-private documents which the law requires to be filed. The authentication resulting from defendant's compelled production of the documents adds little, if anything, to the quantum of knowledge possessed by the court. *See Fisher v. United States,*

supra. We therefore hold that the testimonial aspect involved in producing defendant's tax returns would not be sufficient to rise to the level of fifth amendment protection.

We do not reach the question of whether the privilege might be asserted had the documents sought been purely private papers.

The decision of the Court of Appeals in No. 67 is reversed and the cause is remanded to that court for further remand to the Superior Court Division, Seay, J., having properly retained jurisdiction pursuant to G.S. 1-501 (1979 Cum. Supp.), for proceedings in accordance with this opinion.

No. 112 is remanded to the Superior Court Division, Seay, J., having properly retained jurisdiction pursuant to G.S. 1-501 (1979 Cum. Supp.), for further proceedings consistent with this opinion.

No. 67 - Reversed.

No. 112 - Affirmed in part; vacated in part.

Justice BROCK did not participate in the consideration or decision of this case.