759 Ventures, LLC v. GCP Apartment Inv'rs, LLC, 2018 NCBC 42.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 4138

759 VENTURES, LLC and
GUARDIAN GC, LLC, a North
Carolina limited-liability company,

Plaintiffs,

v.

GCP APARTMENT INVESTORS,
LLC, a Florida limited-liability
company,

Defendant.

**ORDER AND OPINION ON
MOTION TO APPOINT A RECEIVER**

1.     Pending before the Court is Defendant GCP Apartment Investors, LLC's

("GCP") Motion to Appoint a Receiver.  For the following reasons, the Court **DENIES**

the motion without prejudice.

> *Shumaker, Loop & Kendrick, LLP, by Daniel R. Hansen, William H.*
> *Sturges, Megan M. Stacy, and Steven M. Berman, for Plaintiffs.*
>
> *James McElroy & Diehl, P.A., by John R. Buric and John R. Brickley,*
> *for Defendant.*

Conrad, Judge.

I.
BACKGROUND

2.     This litigation arises out of a management dispute between the members of

759 Ventures, LLC, a North Carolina limited liability company that invests in real

estate.  (V. Am. Compl. ¶¶ 1, 3, 4, 15, ECF No. 34 ["Compl."].)  Plaintiff Guardian GC,

LLC ("Guardian") owns a two-thirds membership interest in 759 Ventures, and GCP

owns the other third.  (Compl. ¶ 3.)  At the time 759 Ventures was created in 2013,

Guardian and GCP agreed to serve as equal co-managers, though whether that

continues to be true today is hotly contested. (Operating Agreement of 759 Ventures LLC § 6.1(a), (b), ECF No. 35 ["Op. Agr."]; *see* Compl. ¶ 4.)

3. 759 Ventures does not directly own property but instead holds membership interests "in four single-purpose [entities], each of which owns or did own real estate in Charlotte, North Carolina." (Compl. ¶ 15.) These subsidiary entities, all North Carolina limited liability companies, are: (1) Vyne Residential, LLC ("Vyne"); (2) 28th RO Commercial, LLC ("RO Commercial"); (3) 28th RO Land, LLC ("RO Land"); and (4) Edgeline Residential, LLC ("Edgeline"). (Compl. ¶ 15.) 759 Ventures is the sole manager of each entity. (Compl. ¶¶ 24, 63, 64, 93.)

4. The properties owned by the four subsidiaries are in various stages of development. Vyne sold its only asset, a condominium complex, for a substantial sum in 2016 and currently possesses only a small amount of cash. (*See* Compl. ¶¶ 26–27; Aff. Mazzone ¶ 32, ECF No. 76.1.) RO Land was originally formed "to develop more than 135 residential units" in two phases, but development has not begun, and the land currently serves as a parking lot for tenants of the adjacent building owned by RO Commercial. (Aff. Mazzone ¶¶ 9–10; Compl. ¶ 61.) Finally, part of Edgeline's property is home to thirty-six leased residential units, and the adjacent, undeveloped land is approved for sixty-nine additional units. (Aff. Mazzone ¶ 11.)

5. It isn't clear when Guardian and GCP began to have significant management disagreements, but by mid-2016, their relationship was under stress. When Vyne sold its real property, most of the proceeds were immediately distributed to its members, including 759 Ventures. (*See* Compl. ¶¶ 25–33.) It appears, though,

that Vyne reserved $1.75 million at the direction of GCP, acting through its principal, Max Mazzone. (*See* Compl. ¶ 34.) About six months later, Mazzone sent a letter to Guardian stating that Vyne was distributing the reserved funds, that 759 Ventures was making a corresponding distribution to its members, and that Guardian's share of the distribution would be withheld pending certain actions by Guardian. (*See* Compl. ¶¶ 36–37, Ex. 7.) Guardian asserts that GCP's actions breached 759 Ventures' operating agreement, which authorizes distributions only "upon the consent of those Managers holding a majority" in interest. (Op. Agr. § 7.3(b); Compl. ¶ 21.)

6. Guardian also alleges that it was locked out of important management decisions for RO Commercial and the other properties. (*See, e.g.*, Compl. ¶¶ 65, 94.) In late 2016 and early 2017, for example, RO Commercial began negotiating new leases with its commercial tenants, including Amelie's French Bakery ("Amelie's"). (Compl. ¶¶ 60, 72–73.) Correspondence attached to the amended complaint reveals sharp disagreements between Guardian and GCP about the length of any lease, Amelie's use of RO Land's property for parking, and related considerations. (*See* Compl. Exs. 18–20.) Guardian alleges that GCP conducted the negotiations without Guardian's input and did so in a way that harmed the relationship with Amelie's and other tenants. (*See* Compl. ¶¶ 65–66, 75, 84–88.)

7. Guardian brought this action in March 2017. (*See* ECF No. 1.) Its verified amended complaint asserts claims, individually and derivatively on behalf of 759

Ventures, to remove GCP as manager for breaching 759 Ventures' operating agreement. (Compl. ¶¶ 103–24, 126–36.)

8. GCP responded by filing counterclaims, including a counterclaim for judicial dissolution of 759 Ventures. (Def.'s Aff. Defenses, Answer & Countercl. ¶¶ 24–26, ECF No. 53 ["Countercl."].) GCP alleges it and Guardian "are deadlocked on management decisions" regarding each of the properties owned by 759 Ventures' subsidiaries. (Countercl. ¶ 11.)

9. After exchanging limited discovery, the parties attempted to resolve their differences through voluntary mediation. During that process, the parties considered selling the subsidiaries' real properties. (*See* Jt. Mot. Am. Case Mgmt. Order ¶ 5, ECF No. 69.) They reported an impasse in early January 2018.

10. On March 12, 2018, GCP moved to appoint a receiver to take control of 759 Ventures and its four subsidiaries pending the outcome of the litigation. (Def.'s Mot. to Appt. Rec., ECF No. 76 ["Mot."].) GCP asserts that it and Guardian are deadlocked as to the management of 759 Ventures and the properties owned by each subsidiary. (Mot. ¶ 1.) Believing that property values are "currently at a historically high level," GCP would prefer to sell the properties owned by RO Commercial, RO Land, and Edgeline. (Aff. Mazzone ¶¶ 20–21.) GCP also wants to perform an audit of Vyne's operations and then dissolve the company. (*See* Aff. Mazzone ¶ 33.) It contends that Guardian is standing in the way, demanding to hold and develop the properties. (*See* Aff. Mazzone ¶¶ 9, 13, 19.)

11. Guardian opposes the motion, denying that the parties are deadlocked and arguing that the motion is premature. According to Guardian, the record is unsettled because the parties have not yet completed discovery on the alleged management disagreements. Guardian also asserts that, if it were to prevail on its claim to remove GCP as manager, any management deadlock would be lifted. Guardian has since filed a motion for summary judgment on its claim to remove GCP as manager, which remains pending. (ECF No. 87.)

12. The Court heard argument on May 2, 2018. At the hearing, Guardian agreed that it would be appropriate to dissolve Vyne. Guardian also stated that it was willing to sell the property owned by RO Land, depending on the outcome of a feasibility study. GCP did not object to conducting such a study prior to soliciting or entertaining offers.

13. The motion is ripe for determination.

## II.
## ANALYSIS

14. The question before the Court is whether to appoint a receiver to take possession of 759 Ventures and manage its assets as a prejudgment remedy. On this record, the answer is no.

15. The appointment of a receiver is "a harsh remedy." *Neighbors v. Evans*, 210 N.C. 550, 554, 187 S.E. 796, 798 (1936). It "takes custody" of the disputed property out of the parties' hands "on an interlocutory order, before the court has had an opportunity to hear the merits of the case." *Woodall v. N.C. Joint Stock Land Bank*, 201 N.C. 428, 432, 160 S.E. 475, 478 (1931) (citation and quotation marks omitted).

For that reason, "[t]he right to relief must be clearly shown and also . . . that there is no other safe and expedient remedy." *Neighbors*, 210 N.C. at 554, 187 S.E. at 798.

16. For actions involving claims to dissolve an LLC, our General Assembly has authorized trial courts to "appoint one or more persons to serve as a receiver to manage the business of the LLC pending the court's decision on dissolution." N.C. Gen. Stat. § 57D-6-04(a). That does not mean receivership is automatic or routine in dissolution disputes. It is not. In one of the few opinions addressing section 57D-6-04(a), this Court held that the appointment of a receiver "is contingent upon first reaching a determination that [the moving party] will likely succeed on the merits of [its] claim for judicial dissolution." *Battles v. Bywater, LLC*, 2014 NCBC LEXIS 54, at *20 (N.C. Super. Ct. Oct. 31, 2014); *see also Witz, Biedler & Co. v. Gray*, 116 N.C. 48, 55, 20 S.E. 1019, 1020 (1895) ("[P]laintiffs are not entitled to have this ancillary relief [of the appointment of a receiver] unless they are entitled to the main relief demanded in their complaint[.]").

17. The premise of GCP's claim for dissolution and its motion for appointment of a receiver is the same: that it and Guardian "are hopelessly deadlocked on how to manage 759 Ventures and, particularly, what to do with and how to maximize the value of each and every asset of 759 Ventures." (Def.'s Br. Supp. Mot. for Appt. Rec. 2, ECF No. 77 ["Br. Supp."].) If true, this would be a valid basis for judicial dissolution. By statute, the Court may dissolve an LLC if the complaining member establishes that "it is not practicable to conduct the LLC's business in conformance with the operating agreement and" governing statutes. N.C. Gen. Stat. § 57D-6-

02(2). This language "embrace[s] . . . management deadlock as a valid grounds for dissolution" and, in appropriate circumstances, provides a basis for the appointment of a receiver. *Battles*, 2014 NCBC LEXIS 54, at *22, 24–25.

18. The deadlock in *Battles* was undeniable. The LLC's "member-managers [were] unable to reach agreement with respect to even the most basic management decisions," including "day-to-day operations." *Id*. at *17, 22. Coupled with mutual "accusations of corporate mismanagement and malfeasance," this complete and "persisting management deadlock" posed "a constant and imminent threat of irreparable damage" to the LLC. *Id*. at *19. On that basis, the Court found a likelihood of success on the underlying claim for dissolution and appointed a receiver pending a final decision. *See id*. at *19–20, 24–25 .

19. Here, the evidence is far less compelling. Although the parties undoubtedly have their disagreements, they are neither so deep nor so entrenched as to warrant the appointment of a receiver at this relatively early stage.

20. Indeed, at the hearing, counsel acknowledged that the parties are more or less on the same page as to two of the four properties. They now agree that Vyne should first be audited, followed by dissolution and winding up its operations. (*See also* Aff. Mazzone ¶ 33.) In addition, both parties wish to sell RO Land's property pending the outcome of a feasibility study, which they agree must be conducted. (*See also* Aff. Mazzone ¶¶ 20–21.) Although they may not agree on all the details, it is clear that Guardian and GCP are not deadlocked as to the appropriate next steps in the management of Vyne and RO Land.

21. Disagreements about RO Commercial and Edgeline run deeper. GCP has received several unsolicited offers to purchase the properties, and its desire to accept the best offer appears to be unequivocal. (*See* Aff. Mazzone ¶¶ 13, 20, 22.) Guardian, on the other hand, is content to hold and develop the property.

22. Even so, these disagreements have not made it impracticable to operate the businesses. The properties owned by RO Commercial and Edgeline are managed by third parties, who handle their day-to-day operations. (*See* Aff. Whitley ¶ 3, ECF No. 76.3.) There is some evidence that Guardian and GCP's disagreements have made things more challenging for the property managers, but the properties continue to function and generate income. (*See* Aff. Whitley ¶ 5; Aff. Mazzone ¶¶ 12, 18.) Edgeline, for example, holds over half a million dollars in cash and generates significant cash flow from the payment of monthly rents. (*See* Aff. Mazzone ¶¶ 11, 12.) Our case law strongly disfavors the appointment of a receiver "[w]hen a business is an active, solvent corporation or LLC." *Mooring Capital Fund, LLC v. Comstock N.C., LLC*, 2009 NCBC LEXIS 32, at \*31 (N.C. Super. Ct. Nov. 13, 2009); *see also Camacho v. McCallum*, 2016 NCBC LEXIS 81, at \*31 (N.C. Super. Ct. Oct. 25, 2016) ("Appointment of a receiver is a rare and drastic remedy, especially for solvent companies, and should be used cautiously.").

23. It would be a stretch to say Guardian and GCP agree as much as they disagree about the operation of 759 Ventures and its subsidiaries. Their strained relationship is unlikely to produce vigorous and efficient management. But the record does not reflect the type of "persisting management deadlock" with respect to

"even the most basic management decisions" that required the appointment of a receiver in *Battles*. *See* 2014 NCBC LEXIS 54, at *19, 22. Accordingly, the Court concludes that GCP has not demonstrated a likelihood of success on its claim for judicial dissolution.

24. Even if the record demonstrated a clear, present deadlock, two other considerations weigh against appointing a receiver. (*See* Pls.' Resp. Opp'n to Mot. Appt. Rec. 3–5, ECF No. 86.) First, Guardian has asserted a claim to remove GCP as manager of 759 Ventures. If Guardian prevails, then as a practical matter, that would resolve most, if not all, management disputes. To be clear, this does not mean that the mere existence of Guardian's claim negates GCP's ability to seek a receivership pending a decision on dissolution. Rather, a measure of caution is warranted here because removal of GCP as a manager is the point of Guardian's lawsuit, the claim has not yet been tested (such as, for example, through a motion to dismiss), and Guardian's motion for summary judgment is now pending. It would be premature to appoint a prejudgment receiver without giving due consideration to Guardian's claim.

25. Second, because the appointment of a receiver is "a harsh remedy," courts are reluctant to act in the absence of evidence of "fraud or imminent danger that the property will be, among other things, lost, destroyed, squandered, or wasted." *Williams v. Liggett*, 113 N.C. App. 812, 816, 440 S.E.2d 331, 333 (1994) (citing *Lowder v. All Star Mills, Inc.*, 301 N.C. 561, 577, 273 S.E.2d 247, 256 (1981)). In *Battles*, for example, this Court held that a management deadlock was sufficient to justify the

appointment of a receiver "when coupled with" allegations that the members had "engaged in misconduct and misappropriated" the LLC's funds. 2014 NCBC LEXIS 54, at *24–25.

26. The allegations of fraud and misconduct in this case are rather muted. Each side's pleading alludes to questionable activities by the other, but the allegations seldom rise above mere suspicion. Nothing in the record suggests that, in the absence of a receivership, Guardian would threaten to misappropriate the assets of 759 Ventures.

27. Nor is there any concrete evidence that the properties face the threat of imminent, irreparable harm. Vyne's assets appear to be insubstantial, and the parties have agreed to dissolve the company. As to RO Land, the parties have proposed and agreed to conduct a feasibility study before selling the property. If anything, the appointment of a receiver may complicate and delay these processes.

28. The other two subsidiaries—Edgeline and RO Commercial—hold income-producing properties in high-value locations. Edgeline appears to be solvent and profitable. RO Commercial faces a more challenging situation, but the parties have taken steps to ensure its solvency, at least in the short term. (*See* Aff. Mazzone ¶¶ 17–18.) Although GCP insists that the parties must act now to take advantage of historically high property values, there is always uncertainty when it comes to predicting future market conditions. These are not the type of rare and drastic circumstances that would "justify the immediate appointment of a receiver pending the final outcome of the case." *Williams*, 113 N.C. App. at 817, 440 S.E.2d at 334; *see*

*also Mooring Capital Fund,* 2009 NCBC LEXIS 32, at \*34; *Kazer v. Peterson*, No. 14 CVS 293 (N.C. Super. Ct. Dec. 10, 2014) (ECF No. 94).

\*       \*       \*

29. The management of 759 Ventures isn't perfect. Its equal co-management structure invites stalemate without the promise of easy resolution. But appointing a receiver is a drastic remedy—a last resort. Here, the parties continue to make efforts to overcome their differences, albeit grudgingly. In the absence of more concrete evidence of a true management deadlock and accompanying threat of imminent harm, the Court is reluctant to take the management of 759 Ventures out of the parties' hands.

30. That said, the parties have requested Court review as they work out the next steps for Vyne and RO Land, and the Court remains willing to take appropriate action to facilitate their agreement. The Court is also mindful of the dynamics of both litigation and 759 Ventures' business operations. New factual circumstances or the resolution of one or more pending claims may warrant revisiting the issue of a receivership in the future.

### III.
### CONCLUSION

31. For these reasons, the Court **DENIES** the motion to appoint a receiver without prejudice.

32. The Court also **ORDERS** that, no later than fourteen days after entry of this Order, Guardian and GCP shall meet and confer to develop a plan for auditing, dissolving, and winding-up Vyne; to develop a plan for conducting a feasibility study

for the prospective sale of RO Land; and to file a stipulation or, if necessary, propose a consent order to this effect. If the parties cannot reach full agreement, they shall submit to the Court a joint report setting out with specificity their disagreements and positions.

This the 9th day of May, 2018.

 /s/ Adam M. Conrad          
Adam M. Conrad
Special Superior Court Judge
  for Complex Business Cases