IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-864

Filed 4 June 2024

New Hanover County, Nos. 22JA77-78

IN RE E.H. R.H.

Appeal by respondents from order entered 25 May 2023 by Judge J. H. Corpening, II in New Hanover County District Court. Heard in the Court of Appeals 2 April 2024.

> *The Law Group, by L. Bryan Smith, Melissa S. Gott, and Christian J.W. Jones, and Godwin Law Firm, by David M. Godwin, for the respondent-appellant-mother and respondent-appellant-father.*
>
> *New Hanover County DSS, by Jill R. Cairo, and Q. Byrd Law, by Quintin D. Byrd, for the petitioner-appellee and the guardian ad litem.*

TYSON, Judge.

Respondent-Mother ("Mother") and Respondent-Father ("Father") appeal from initial adjudication and disposition order entered on 23 May 2023, which adjudicated their youngest minor child as abused and neglected and their older child as neglected. We affirm in part, vacate in part, and remand.

## I. Background

Mother and Father are married and are the biological parents of E.H. and R.H. *See* N.C. R. App. P. 42(b) (pseudonyms used to protect the identity of minors). E.H. was born on 14 April 2022. He was three weeks old when the New Hanover County

Department of Social Services ("DSS") assumed nonsecure custody of E.H. on 9 May 2022. His brother, R.H., was four years old.

The children's paternal grandfather ("Grandfather") lives with Mother, Father, E.H., and R.H. Mother and Grandfather voluntarily brought E.H. to Novant New Hanover Regional Medical Center ("NHRMC") around 7:00 p.m. on 8 May 2022 and presented him to have his right arm examined. Mother explained she had heard a "pop" in E.H.'s right arm while changing his diaper earlier in the day, between noon and 1:00 p.m. Mother's concern deepened when E.H. had stopped using his right arm, and she sought medical care that afternoon.

A radiologist secured and reviewed x-ray scans of E.H.'s right arm. The scan revealed E.H.'s right humerus, i.e., the long bone in the arm, was fractured midway. The fracture was recent or "acute", showing no signs of healing. The radiologist concluded the fractures had occurred between seven and ten days prior to the date of the scans.

Dr. Laura Parente was E.H.'s attending physician from his birth and during the visit to the emergency room. Dr. Parente noted E.H. was delivered via a scheduled c-section, with no complications or difficulties causing the injuries. Following the results of the initial x-ray, a full-body skeletal survey of E.H. was ordered.

Dr. David Evans, a board-certified pediatric radiologist, reviewed the full skeletal survey and the earlier x-ray of E.H.'s right arm. Dr. Evans agreed with the

earlier finding that E.H.'s right humerus was acutely fractured. He also observed additional metaphyseal fractures, i.e., corner fractures, of E.H.'s distal left tibia, distal left femur, and proximal left tibia, and possible metaphyseal fractures of E.H.'s distal right femur, proximal right tibia, and distal left ulna.

All fractures revealed on the skeletal survey were deemed to be acute, as none of the fractures showed signs of healing, and all had purportedly occurred "no more than 10 days prior to the skeletal survey." Dr. Evans noted E.H.'s injuries are "virtually pathognomonic of nonaccidental trauma" and opined such injuries are inconsistent with an accident.

Dr. Parente ordered a full medical workup for E.H. after being informed of the results of Dr. Evans' skeletal survey. E.H.'s brain MRI, eye examination, bloodwork, and urine testing were unremarkable, and no other clinical concerns were discovered.

Taylor Antczak, a social worker in the forensics investigation department, met separately with Mother and Father on 9 May 2022. Mother repeated the same information she had stated upon arrival at the ER, describing hearing a "pop" during a diaper change and E.H's loss of use of his right arm. She indicated the prior twenty-four hours had been "normal." Mother offered the baby carrier/stroller could have caused E.H.'s injury, but she demonstrated proper use of the carrier. She denied any falls, drops, motor vehicle accidents, abnormal fussing, or abnormal interactions between four-year-old R.H. and E.H. She also denied sleeping with E.H. and claimed E.H. had "not been out of her sight" since he was born.

Antczak visited with Father at the family home. Father repeated the story regarding Mother hearing a "pop" during a diaper change, but when asked to demonstrate his interaction with E.H., nothing from the demonstration could have caused the multiple injuries E.H. had sustained. Father, similar to Mother, denied the possibility of any accidents, falls, or other events that could have caused E.H.'s injuries. He confirmed Mother was E.H.'s primary caretaker. Father explained Mother had suffered from post-partum depression following the birth of R.H. years earlier, but denied any post-partum depression symptoms following the birth of E.H.

A petition was filed on 9 May 2022, which alleged E.H. to be an abused and neglected juvenile and asserted R.H. to be a neglected juvenile. An order granting nonsecure custody of both children to DSS was filed on 10 May 2022.

DSS referred E.H. to the Beacon Team at UNC Hospital in Chapel Hill for further evaluation. One-third of the cases referred to the Beacon Team clinic are opined to be of low suspicion for abuse, one-third are indeterminate, and one-third are opined as high suspicion for abuse.

Dr. Samantha Schilling is a board-certified physician, specializes in child abuse pediatrics, and is a member of the Beacon Team. Dr. Schilling met with Mother and Father and inquired about a family history of metabolic disorders, which both denied. The parents also denied a history of bone fractures for themselves or for their other son, four-year-old R.H. Mother and Father both have hypermobile Ehlers-Danlos Syndrome ("EDS"), which is a generalized joint hypermobility syndrome. Dr.

Schilling opined this syndrome cannot be diagnosed in a child under the age of eight, and the syndrome is not associated with an increased risk of developing fractures.

Dr. Schilling consulted with Dr. Carolina Guimaeres, the Chief of the Pediatric Radiology Department at UNC Hospital. Follow-up skeletal surveys and x-rays of E.H. were conducted on 23 May 2022, 22 June 2022, and 10 August 2022.

Dr. Guimaeres opined the process of dating when fractures actually occur is difficult. It generally takes between seven and fourteen days before subacute healing, such as callous formation and the generation of new bone, may be detected on medical scans. The injuries to E.H.'s right arm and left ankle showed some healing and new bone formation on the 23 May 2022 scans. Dr. Guimaeres also observed two of E.H.'s ribs were acutely fractured on the 9 May 2022 scan, although those rib fractures were not originally visible and noted by NHRMC's scans. The rib fractures exhibited subacute signs of healing on the 23 May 2022 scan.

Dr. Guimaeres observed two additional acute injuries to E.H.'s right tibia (ankle) and right humerus (elbow) on the 23 May 2022 scan, which placed those injuries at the outer limit of the seven-to-fourteen-day "acute" window before healing is observable. The Child Medical Evaluation conjectured these previously undetected fractures to E.H.'s right ankle and elbow may have been present on the initial skeletal survey conducted on 9 May 2022, but may have been overlooked because of "suboptimal skeletal survey technique." The newly-revealed right ankle and elbow injuries showed no signs of healing on the 23 May 2022 scan, unlike the other acute

fractures detected on the previous scan on 9 May 2022.

No new or "acute" fractures were detected a month later on the 22 June 2022 or from the 10 August 2022 scans. Dr. Guimaeres opined E.H. possessed normal bone density on each of his scans, and no observations indicated rickets nor any other underlying medical condition to cause E.H.'s injuries. Dr. Guimaeres reported her findings to Dr. Schilling and the Beacon Team. She opined significant force was needed to cause the fractures E.H. had presented with, and those particular injuries have a high specificity for child abuse in a non-ambulatory child.

Dr. Schilling testified to the following regarding the origins of E.H.'s fractures: a fracture of the right humerus is normally the result of blunt force trauma; rib fractures are typically the result of compression of the chest; and, metaphyseal/corner fractures are typically the result of indirect force such as shearing, twisting, or shaking. Dr. Schilling made a tentative diagnosis of physical abuse pending genetic testing results.

Dr. Clara Hildebrandt, an UNC Assistant Professor of Pediatric Genetics, performed genetic testing on E.H. After testing and examining genetic variants, Dr. Hildebrandt opined no underlying genetic condition was present to have caused or contributed to E.H.'s injuries.

E.H. resides in a licensed foster home in New Hanover County and has been in an out-of-home placement for over a year since the nonsecure custody order was filed on 10 May 2022. R.H. lives with his maternal grandmother in the family home,

as Mother, Father, and the Grandfather had moved out. Mother and Father visit with both E.H. and R.H. for two hours each week at DSS. Additionally, Mother and Father visit with R.H. in the community under the maternal grandmother's supervision.

Mother was charged with felony child abuse inflicting serious bodily injury on 28 September 2022. The initial adjudication hearing was held across several sessions on 14-17 November 2022, 12-13 December 2022, and 18 January 2023. An order was entered five months later on 25 May 2023, adjudicating E.H. as abused and neglected as defined in N.C. Gen. Stat. §§ 7B-101(1) and (15) (2023). R.H. was adjudicated as neglected pursuant to N.C. Gen. Stat. § 7B-101(15). As of the time the initial adjudication order was entered, the felony child abuse charge against Mother remained pending.

Mother and Father each timely filed notices of appeal on 19 June 2023.

## II.    Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7B-1001(a)(3) (2023).

## III.    Issues

Mother and Father first argue the trial court erred by adjudicating E.H. as abused. They assert no clear and convincing evidence supports the following findings of facts: (1) E.H. was in the exclusive care of Mother and Father when the injuries occurred; (2) Mother and Father were responsible for E.H.'s injuries; and (3) E.H.'s

injuries were inflicted by non-accidental means.

Mother and Father next argue the trial court erred by adjudicating E.H. as neglected, because no clear and convincing evidence supports a finding of neglect. They assert "the trial court made no additional findings of fact regarding actual neglect but simply bootstrapped neglect to the abuse allegations."

Finally, Mother and Father argue the trial court erred by adjudicating R.H. as neglected based solely upon the unexplained injuries to E.H.

**IV.    Abuse and Neglect Adjudication of E.H. and R.H.**

**A. Standard of Review**

In reviewing an adjudication order, this Court must determine "(1) whether the findings of fact are supported by clear and convincing evidence, and (2) whether the legal conclusions are supported by the findings of fact." *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000) (citations and internal quotation marks omitted).

The "clear and convincing" standard of review "is greater than the preponderance of the evidence standard required in most civil cases." *In re Smith*, 146 N.C. App. 302, 304, 552 S.E.2d 184, 186 (2001) (citation and quotation marks omitted). Clear and convincing evidence is "evidence which should fully convince." *Id.* (citation and quotation marks omitted).

"In a non-jury neglect adjudication, the trial court's findings of fact supported by clear and convincing competent evidence are deemed conclusive, even where some

evidence supports contrary findings." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997) (citations omitted). Unchallenged findings of fact are presumed to be supported by sufficient evidence and are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted).

### B. Abuse Adjudication of E.H.

"The allegations in a petition alleging that a juvenile is abused, neglected, or dependent shall be proved by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2023).

An "[a]bused" juvenile is one "whose parent, guardian, or caretaker" either "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means." N.C. Gen. Stat. § 7B-101(1)(a).

Mother and Father argue several of the trial court's findings of fact and conclusion of "serious physical injury by other than accidental means" are not supported "by clear and convincing evidence." *Id.* §§ 7B-101(1)(a) and 805. We address each argument in turn.

### 1. *Finding of Fact 72*

Mother and Father first argue Finding of Fact 72, which found Mother and Father were the only caretakers of E.H., is unsupported.

Social Worker Antczak testified Mother had explained during the investigative interview that E.H. had been exclusively in her care:

Q: And did you inquire of [Mother] as to any caretakers

that had provided care anytime for [E.H.] since his birth?

A: She indicated that she was the primary caretaker. She specifically said that he had not left her sight. However, she did say that when grandpa and dad are home, they will help her care for the child.

She also testified the paternal grandfather had never cared for E.H. without Mother or Father being present:

Q: And did the paternal grandfather also reside in that residence?

A: He did.

Q: And at the time of the investigation, was he employed fulltime?

A: He was.

Q: And did it appear from your investigation that the paternal grandfather had ever cared for [E.H.] separately from one or both parents?

A: No.

Dr. Parente also testified regarding whether anyone other than Mother and Father had cared for E.H. in the first four weeks of his life:

Q: And as part of taking that history from the parents, did you inquire as to whether [E.H.] had been to daycare or attended by any other caregivers other than the parents?

A: I did. Again, as a standard in any baby, you're admitting to the hospital with this type of injury, so I did ask about babysitters and daycare and who has been around the child since he has been born, and the answer was that it was the parents only and no other caregivers.

Mother and Father also argue the portion of Finding of Fact 72, providing Mother and Father were responsible for E.H.'s injuries, is not supported. This argument is premised on their first argument. Mother and Father argue: "Since baby E[.]H[.] was not in the exclusive care of Respondent-parents, the trial court's determination of abuse rests solely on baby E[.]H[.]'s unexplained injuries[.]"

Here, the trial court's finding Mother or Father was responsible for E.H.'s injuries is not premised solely upon E.H.'s injuries alone. Dr. Evans at NHRMC testified E.H.'s injuries were "virtually pathognomonic of nonaccidental trauma," and explained E.H.'s injuries were not accidental.

Dr. Schilling at UNC Hospital opined E.H.'s injuries resulted from the following actions: blunt force trauma caused the break in his arm, the compression of the chest caused the fractures to his ribs, and shearing, twisting, or shaking caused the metaphyseal/corner fractures of his other bones. Finally, Dr. Guimaeres testified significant force was needed to cause the fractures E.H. had presented with, and she explained those injuries are highly indicative of child abuse, especially in a three-week-old, non-ambulatory child.

Finding of Fact 72 is sufficiently supported. *In re Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676; *In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365. Mother's and Father's argument is overruled.

### 2. *Finding of Fact 78*

Mother and Father argue the trial court's finding E.H.'s injuries were inflicted

by non-accidental means was not supported by competent evidence. They assert the two injuries discovered on 23 May 2022, which was fourteen days after Mother and Father had custody of E.H. and fifteen days after E.H. was taken to NHRMC, indicate E.H.'s injuries would not have occurred while in their care.

The trial court correctly found the acute fractures to E.H.'s right ankle and right elbow depicted on the 23 May 2022 scan were "at the outer limit of the 7- to 14-day window expected for acute injuries" given E.H. had been removed from Mother's and Father's care on 9 May 2022. Dr. Guimaeres opined the fractures "were likely present on the initial skeletal survey," but were purportedly "overlooked" by "suboptimal skeletal survey technique[s]" by a board-certified pediatric radiologist and the imaging equipment at NHRMC, a teaching hospital, regional referral center, and Level 2 Trauma Center in New Hanover County. Subsequent skeletal scans completed in June and August showed no additional acute fractures.

Mother and Father also argue their medical expert witnesses found E.H. may have suffered from rickets or hypermobile EDS, which presented an alternative explanation for E.H.'s injuries. Dr. Schilling opined this syndrome cannot be diagnosed in a child under the age of eight, and the syndrome is not associated with an increased risk of developing fractures. Further, the trial court found in Finding of Fact 70:

> The Respondent-Parents jointly presented expert testimony from Dr. David Ayoub, testifying as an expert witness in the field of general radiology, Dr. Marvin Miller,

testifying as an expert witness in the field of genetics, and Dr. Michael Holick, testifying as an expert witness in the fields of internal medicine and metabolic bone disease. In reviewing all of the evidence while the case was under advisement, the Court assigns almost no credibility to the testimony of these witnesses; specifically, the testimony was not grounded in sound medical principles, reflected out-of-date medical theory, and was not reflective of the current prevailing medical knowledge in the area of child physical abuse. Further, the information provided in their respective evaluations and the opinions drawn therefrom are not the product of reliable principles and methods nor did each apply sound scientific principles and methods reliably to the facts of the case.

Mother and Father tendered multiple properly qualified expert witnesses, which were admitted. The trial court concluded their testimonies were not based on "sound scientific principles and methods" and lacked "credibility." The trial court was presented with contradictory expert witness opinions, and in its wisdom and discretion found DSS' more credible.

Dr. Guimaraes opined E.H.'s bone metaphysis is inconsistent with cuffing, as his bones were smooth and not frayed.

> Q: And can you tell us what you would expect to see if an infant was suffering from rickets?
>
> A: So rickets has a few things in the bone. One is the [indiscernible] will be decreased, which is not the case here, but also we'll have what is called cuffing and fraying of the metaphysis. So the metaphysis, instead of looking smooth like it is here, they look frayed and very typical. They are casuistic. You can also see findings in the ribs called the rachitic rosary where you have an increased size of the anterior portion of the ribs, which we don't see it here.

Q: And you didn't see evidence of any of those symptoms, is that correct?

A: Correct, no.

Q: But other than the fractures, did you see any deformities or anomalies in [E.H.]'s skeletal survey?

A: No.

Q: Any red flags at all for any underlying conditions that may have been the causation of these fractures?

A: No.

Dr. Evans explained DSS' team of physicians ruled out osteogenesis imperfecta, rickets, and other metabolic bone conditions as a possible explanation for E.H.'s injuries, testified he treats multiple cases of rickets each year, and opined E.H.'s bones showed no signs of rickets.

Regarding Mother's and Father's hypermobile EDS, Dr. Schilling opined no studies indicate hypermobile EDS creates an increased risk of fractures in children. She opined this lack of risk was confirmed by neither parent nor the brother R.H. having a history of suffering from bone fractures.

Finding of Fact 78 is supported by contradictory expert witnesses' testimonies. *In re Helms,* 127 N.C. App. at 511, 491 S.E.2d at 676; *In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365. Mother's and Father's argument is overruled.

## C. Neglect Adjudication of E.H.

A "[n]eglected" juvenile is one "whose parent, guardian, custodian, or

caretaker" engages in certain statutorily defined criteria, including failing to "provide proper care, supervision, or discipline" or "[c]reat[ing] or allow[ing] to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15)(a), (e).

Mother's and Father's argument regarding whether E.H. was neglected is: "The trial court made no additional findings of fact regarding actual neglect but simply bootstrapped neglect to the abuse allegations. Give[n] the arguments *supra*, there was no clear and convincing evidence that baby E[.]H[.] was abused[,] and thus the trial court's finding of neglect should be overturned as well."

The trial court made other findings regarding E.H.'s neglect. The trial court explained, until the cause of E.H.'s injuries is established, "their home [is] an injurious environment for any juvenile as there are no reasonable means to protect any juvenile from a similar injury occurring in the home."

Mother's and Father's consistent "explanations" for how E.H.'s arm was broken during a diaper change were challenged by numerous experts and the social worker, who had observed the parents perform a proper diaper change. The diaper change account also fails to account for the numerous other fractures discovered on E.H.'s skeletal survey. Until the perpetrator or perpetrators of E.H.'s injuries are established, Mother's and Father's home presents a potentially injurious environment for E.H. Mother's and Father's argument is without merit.

**D. Neglect Adjudication of R.H.**

"In determining whether a juvenile is a neglected juvenile, it is *relevant* whether th[e] juvenile lives in a home . . . where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C. Gen. Stat. § 7B-101(15) (emphasis supplied).

DSS carries the burden to overcome the presumption of fitness and parental rights to the care, custody, and control of their children and to prove by clear, cogent, and convincing evidence the existence of neglect, as is defined in the statute. N.C. Gen. Stat. § 7B-805. *See* N.C. Gen. Stat. § 7B-1109(f) (2023) ("The burden in such proceedings shall be upon the petitioner or movant and all findings of fact shall be based on clear, cogent, and convincing evidence."); *In re Evans*, 81 N.C. App. 449, 452, 344 S.E.2d 325, 327 (1986) ("The State then has the burden, at the adjudicatory hearing stage, to prove neglect and dependency by clear and convincing evidence." (citation omitted)).

A finding of "prior abuse, standing alone, is not sufficient to support an adjudication of neglect." *In re N.G.*, 186 N.C. App. 1, 9, 650 S.E.2d 45, 51 (2007). In multiple cases "this Court has generally required the presence of other factors to suggest that the neglect or abuse will be repeated." *In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014) (citing first *In re C.M.*, 198 N.C. App. 53, 66, 678 S.E.2d 794, 801-02 (2009); then *In re A.S.*, 190 N.C. App. 679, 690-91, 661 S.E.2d 313, 320-21 (2008); and then *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005)).

While the decision of the trial court regarding whether the other children present in the home are neglected, "must of necessity be predictive in nature, [ ] the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999).

The trial court found:

> 71. Given the family's circumstances and living arrangement from mid-April through May 8, 2022, [R.H.] was necessarily present in the home when the injuries were inflicted on [E.H.] *Without either Respondent-parent taking accountability or providing any plausible explanation for [E.H.]'s injuries,* there is a substantial risk of both [E.H.] and [R.H.] of being subjected to physical abuse and neglect in that household. Due to his tender years, [R.H.] is at risk for being subjected to the same infliction of injuries as [E.H.]

**(**emphasis supplied).

The trial court's findings of fact regarding R.H. rely solely upon E.H.'s abuse and fail to mention any prior abuse of R.H. or other evidence predictive of probable neglect of R.H., which "is not sufficient to support an adjudication of neglect." *In re N.G.*, 186 N.C. App. at 9, 650 S.E.2d at 51. The trial court's findings of fact do not address whether other factors were present "to suggest that the neglect [of R.H] . . . will be repeated." *In re J.C.B.*, 233 N.C. App. at 644, 757 S.E.2d at 489 (citations omitted). The testimony and record show no prior history of neglect or abuse of E.H. or of R.H.

- 17 -

The statute does not allow the trial court to rely solely on the abuse or neglect of E.H. to support the adjudication of R.H. as neglected, only that such evidence is "relevant" and is not conclusive to relieve DSS of its burden. N.C. Gen. Stat. § 7B-101(15). *See In re A.L.*, 279 N.C. App. 683, 863 S.E.2d 328, 2021 N.C. App. LEXIS 561, 2021 WL 4535716, at *3 (unpublished) (2021) (remanding an order, which adjudicated a juvenile neglected, ceased reunification efforts, and established a permanent plan of guardianship with a court approved caretaker, to the trial court for further findings because the order "focus[ed] almost entirely on the prior adjudications of abuse and neglect of Amy's older sister Jennifer").

The trial court is mandated to make additional findings of fact and supported conclusions regarding the purported and probability of future "neglect" of R.H., and the trial court must determine whether other evidence tends to indicate any abuse or neglect would likely be repeated against R.H. *Id.*; *In re J.C.B.*, 233 N.C. App. at 644, 757 S.E.2d at 489 (citations omitted).

The transcripts and record appear devoid of any clear and convincing evidence of neglect of R.H., other than the *ipso facto* application of non-confessed and unexplained injuries to E.H. to overcome the presumption of fitness and primary parental rights by married parents, who have no prior history of either neglect or abuse, and with one facing a felony indictment for child abuse. *See* N.C. Gen. Stat. §§ 7B-805 and 1109(f); *In re Evans*, 81 N.C. App. at 452, 344 S.E.2d at 327.

The statutory burden to prove abuse or neglect or any basis for the State to

interject and interfere with constitutional and natural parental rights always rests upon the State with proof of clear, cogent, and convincing evidence. *Id.*

This burden cannot be relieved by the trial court under ultimatum threats to the parents "to confess or lose your children", or violating marital privilege, particularly in the face of pending criminal charges. *Id.* Nor can these threats overcome the presumption of fitness and consistent parental conduct. *See Adams v. Tessener,* 354 N.C. 57, 62, 550 S.E.2d 499, 503 (2001) (explaining the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the North Carolina Constitution protects "a natural parent's paramount constitutional right to custody and control of his or her children" and ensures that "the government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody or where the parent's conduct is inconsistent with his or her constitutionally protected status." (citations omitted)); *Owenby v. Young*, 357 N.C. 142, 148, 579 S.E.2d 264, 268 (2003) ("Until, and unless, the movant establishes by clear and convincing evidence that a natural parent's behavior, viewed cumulatively, has been inconsistent with his or her protected status, the 'best interest of the child' test is simply not implicated."); *Troxel v. Granville*, 530 U.S. 57, 66, 147 L.Ed.2d 49, 57 (2000) ("[W]e have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (citations omitted)).

## V. Conclusion

- 19 -

The trial court's findings of fact regarding abuse of E.H. were supported by clear and convincing evidence. *In re Helms*, 127 N.C. App. at 511, 491 S.E.2d at 676; *In re Gleisner*, 141 N.C. App. at 480, 539 S.E.2d at 365. The portion of the trial court's order adjudicating E.H. as abused and neglected is affirmed.

The portion of the trial court's order adjudicating R.H. as neglected, however, is remanded for the trial court to make additional findings, in the absence of a compelled confession by either parent or violation of the marital privilege, regarding whether statutorily-mandated evidence exists and DSS has carried its burden to overcome the parental presumption of fitness and parental conduct to support and adjudicate R.H. as neglected. *In re J.C.B.*, 233 N.C. App. at 644, 757 S.E.2d at 489. *It is so ordered.*

AFFIRMED IN PART; VACATED IN PART; AND REMANDED.

Judge GORE concurs.

Judge Stroud concurs in part and dissents in part by separate opinion.

No. COA23-864 – *In re: E.H. & R.H.*

STROUD, Judge, concurring in part and dissenting in part.

I concur with the majority opinion as to the adjudication of E.H. as abused and neglected, but I dissent as to the adjudication of neglect of R.H. I believe the trial court's extensive and detailed findings of fact, all of which are supported by the record and are binding on appeal, are more than sufficient to support the adjudication of neglect as to R.H.

Although the majority opinion has addressed the challenged findings of fact and correctly held each to be supported by the evidence, I would note that the trial court's order includes over eleven full pages of findings of fact, with the incorporation of an additional twelve pages of the Child Medical Evaluation ("CME") Report from "the Beacon Team at UNC Hospital in Chapel Hill, North Carolina." The Beacon Team "is a group of doctors and social workers who evaluate cases where there may have been abuse of a child or an elderly person" with the goal of providing "an objective analysis of all available medical evidence" and "additional diagnostic testing" as needed "to determine whether other potential causes of injury can be ruled out." The trial court heard six days of testimony and received hundreds of pages of evidence at the hearing. The Beacon Team carefully considered every possible alternative explanation for E.H.'s injuries but ultimately concluded "the sole causation for each and every one of [E.H.]'s observed injuries is child physical abuse."

Most of the findings address E.H.'s injuries and the various alternative explanations for the injuries which the Beacon Team and the trial court considered

and rejected, but some of the findings address the behavior of Mother and Father when E.H.'s injuries were discovered. Mother's "affect was noted to be 'flat' during the interview" with the social worker on 9 May 2022 just after the report of the unexplained fractures. Father "did not go to the hospital at any time from May 8 to May 10, 2022." The social worker located Father at home on 9 May 2022. He also denied "any falls, accidents, trauma or other incident which would have caused the multiple fractures to [E.H.]." Father "repeated the same story as . . . Mother regarding the diaper change on May 8 and said he did not initially think much about it." In contrast, in his "sworn testimony during th[e] hearing," Father asserted that "when he heard the 'pop' in [E.H.]'s shoulder area during a diaper change on May 8, 2022, that he 'froze,' 'felt ill,' and wanted to immediately go to the ER." He said the diaper change was "around noon or 1:00 p.m.," but E.H. "was not taken to the ER until approximately 6 to 7 hours later, during which time, the family went to Walmart and to visit the paternal great-grandparents." Moreover, "[w]hen the decision was made to go to the ER later that evening, . . . Father stayed home with [R.H.] and did not at any time go to the hospital, even after the right arm fracture was found and after the multiple fractures were identified."

Although the primary focus of the order is the cause of E.H.'s injuries, these findings are still important to consider as the basis for the trial court's conclusion R.H. was neglected based upon his presence in the home where E.H.'s abuse occurred. After fully addressing E.H.'s injuries, the trial court then found:

68. As noted in the CME Report, "[c]hildren, and especially young infants, who experience physical abuse or neglect are at risk for future harm or even death if returned to the same environment in which they sustained abuse/neglect."

69. Dr. Schilling is of the opinion that there is no way that [E.H.] could have experienced the trauma necessary to cause his injuries without his caregivers being aware of it.

. . . .

71. Given the family's circumstances and living arrangement from mid-April through May 8, 2022, [R.H.] was necessarily present in the home when the injuries were inflicted on [E.H.]. Without either Respondent-Parent taking accountability or providing any plausible explanation for [E.H.]'s injuries, there is a substantial risk of both [E.H.] and [R.H.] of being subjected to physical abuse and neglect in that household. Due to his tender years, [R.H.] is at risk for being subjected to the same infliction of injuries as [E.H.].

72. The parents, as the only caretakers for [E.H.], are responsible for his injuries. The Court cannot determine if a parent does not know what happened, knows what happened and will not tell on the other parent, or is the parent who inflicted the injuries. The Respondent-Parents continue to maintain that they are not responsible for these injuries, and as such, this renders their home an injurious environment for any juvenile as there are no reasonable means to protect any juvenile from a similar injury occurring in the home. The Court currently cannot separate the parents as to culpability and has no way to address the issues as long as each parent maintains his/her current position that he or she did not injure the child and does not know how the child was injured. The Juveniles would be at risk if placed back in the home with Respondent-Mother and/or Respondent-Father.

73. No other reasonable means were available to protect the Juveniles at the time of the filing of the petition other

than placement out of the home.

The majority considers the detailed and extensive findings of fact insufficient to support an adjudication of neglect of R.H. and characterizes the trial court's order as an "*ipso facto* application of non-confessed and unexplained injuries to E.H. by married parents with no prior history of either neglect or abuse, and with one facing a felony indictment for child abuse." I agree it is particularly troubling when two parents with no apparent prior history of neglect or abuse are accused of causing serious injury to a baby or of allowing serious injury to occur without taking prompt action to protect the baby. But this case is no different from many others in this regard. Cases dealing with serious non-accidental injuries to a baby are some of the most "challenging and tragic" of abuse, neglect, or dependency cases. *See In re M.T.*, 285 N.C. App. 305, 306, 877 S.E.2d 732, 736 (2022) (noting that "cases arising from serious and life-threatening non-accidental injuries to a baby are perhaps the most challenging and tragic of all").

This Court addressed a similar situation, including the adjudication of neglect of an older sibling who was not injured, in *In re M.T.*:

> Here, as in most cases involving life-threatening nonaccidental injuries to a baby, there is no direct evidence of exactly what happened. A baby cannot tell anyone what happened, and no one, other than someone who hurt the baby, saw what happened. Trial courts must often make these difficult and momentous decisions based upon circumstantial evidence and evaluation of credibility and weight of the evidence. In this case, the trial court carefully considered evidence from many witnesses and hundreds of

4

> pages of exhibits and reports, including medical records, presented at hearings held over many days.

*Id.* at 306-07, 877 S.E.2d at 736.

In *In re M.T.*, Mark's baby brother Ken had serious non-accidental injuries; both children also lived in a home with their mother and father, with no prior history of abuse or neglect. *Id.* at 308, 877 S.E.2d at 737. Later, after DSS's removal of the children from the home and further investigation, the father was charged with child abuse. *Id.* at 317, 877 S.E.2d at 742. The mother challenged the trial court's adjudication of the older child, Mark, who was not injured in any way, as neglected for the same reasons as Mother and Father in this case:

> As to Mark, [the m]other specifically asserts the neglect adjudication "is based on the circumstances relating to Ken's abuse or neglect in 2017" and "there are no supported findings establishing the presence of other factors with a nexus to Mark or to the likelihood he would be neglected by Mother if his custody was returned to her."

*Id.* at 344, 877 S.E.2d at 758 (alterations omitted).

This Court affirmed adjudications of neglect of another child in the home in cases where the parents are unable to explain serious injury to a baby and there is no other person who might have harmed the child. *Id.* at 354-55, 877 S.E.2d at 764-65. "[T]he trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re T.S.*, 178 N.C. App. 110, 113, 631 S.E.2d 19, 22 (2006). Trial courts must at times draw a reasonable inference from circumstantial evidence to prevent harm to a child:

5

> Caselaw also demonstrates why the lack of explanation can be so important. In a case the Coalition acknowledges is relevant to this consideration, our Supreme Court explained a parent's "refusal to make a realistic attempt to understand how her child was injured" can help support a "trial court's conclusion that the neglect is likely to reoccur." *In re D.W.P.*, 373 N.C. [327,] 340, 838 S.E.2d [396,] 406 [2020]. The *In re D.W.P.* Court inferred if a parent is not able to explain how their children were harmed before, there is a risk the children will be harmed the same way again if returned to the parent's custody, and that is a risk our courts are not required to take. *See id.*, 373 N.C. at 339-40, 838 S.E.2d at 406 (explaining the paramount importance of child safety before drawing the conclusion in the previous sentence). The trial court here permissibly drew the same inference explaining in Findings 87 and 88, which we have found support for above, the lack of explanation of Ken's injuries means there is a continued "risk to both children's health and safety."

*In re M.T.*, 285 N.C. App. at 349-50, 877 S.E.2d at 761-62 (brackets omitted).

In some cases, as noted by the majority, there are other facts present, in addition to the non-accidental injury to a baby, which may also indicate a risk of abuse or neglect to another child in the home, such as mental health concerns or substance abuse. But these other factors *are not always required* for a child who lives in the home with another child who has been abused and adjudicated as neglected. The trial court must evaluate the credibility and weight of all the evidence and has the discretion to make logical inferences which are reasonably based upon the facts in the case. *See In re A.S.*, 190 N.C. App. 679, 690, 661 S.E.2d 313, 320 (2008) ("Since the statutory definition of a neglected child includes living with a person who has abused or neglected other children and since this Court has held that the weight to

6

be given that factor is a question for the trial court, the trial court, in this case, was permitted, although not required, to conclude that Adam was neglected based on evidence that respondent had abused Teresa by intentionally burning her.").

The majority opinion also strongly implies that the trial court is not permitted to draw a negative inference against a parent from the parent's silence or failure to give a plausible explanation of how a child's injury occurred, apparently based either upon the Fifth Amendment right against self-incrimination or upon marital privilege, as one spouse cannot be compelled to testify against the other. I first note that Mother and Father did not raise any argument on appeal regarding any infringement of their Fifth Amendment rights against self-incrimination or marital privilege. Since Chapter 7B specifically precludes them from making these arguments, that is not surprising. *See* N.C. Gen. Stat. § 7B-310 (2023); N.C. Gen. Stat. § 7B-1109(f) (2023). But since the majority has addressed this right and privilege and remanded to the trial court to make additional findings, I will further note my concerns regarding this portion of the majority opinion.

First, the majority opinion fails to cite any law supporting its position that "[t]his burden cannot be relieved by the trial court under ultimatum threats to the parents 'to confess or lose your children', or violating marital privilege, particularly in the face of pending criminal charges." It cites statutes noting the standard of proof of clear, cogent, and convincing evidence; I agree with the majority that the trial court's findings of fact are supported by clear, cogent, and convincing evidence and

7

the order so stated. *See* N.C. Gen. Stat. § 7B-805 (2023). Oddly, the majority also cites to North Carolina General Statute Section 7B-1109(f), which states the same requirement of clear, cogent, and convincing evidence in termination of parental rights adjudications and then provides that "[n]o husband-wife or physician-patient privilege shall be grounds for excluding any evidence regarding the existence or nonexistence of any circumstance authorizing the termination of parental rights." N.C. Gen. Stat. § 7B-1109(f). The next citation is to *In re Evans*, 81 N.C. App. 449, 344 S.E.2d 325 (1986). I will not quote from *Evans*, as it was decided in 1986 based upon very different statutes regarding abuse and neglect than are now in effect, but in *Evans*, I can find nothing to support the majority's assertions regarding "ultimatum threats" or marital privilege. *See id.* at 451, 344 S.E.2d at 326. In *Evans*, this Court upheld the trial court's adjudication of neglect but disapproved of the trial court's order for the mother to "provide a separate bed" for the child and "submit to psychiatric or psychological evaluation or treatment *separate and apart* from her 'participation' in [the child's] treatment." *Id.* at 453, 344 S.E.2d at 328 (emphasis in original).[1]

The majority's remaining citations are to cases addressing a natural parent's paramount right to custody. Again, I entirely agree with these statements of law, but

---

[1] North Carolina statutes in effect at that time did not allow the trial court to order this type of psychiatric or psychological evaluation and treatment; our current statutes do. *See* N.C. Gen. Stat. § 7B-904 (2023) ("Authority over parents of juvenile adjudicated as abused, neglected, or dependent").

these cases do not address the issues raised in this case. Nor do they tend to support the majority's position. In *Adams v. Tessener*, 354 N.C. 57, 66, 550 S.E.2d 499, 505 (2001), the Supreme Court of North Carolina affirmed the trial court's order granting custody to grandparents based upon findings of the parents' unfitness.[2] In *Owenby v. Young*, 357 N.C. 142, 148, 579 S.E.2d 264, 268 (2003), the Supreme Court of North Carolina affirmed the trial court's dismissal of a custody claim against the child's father filed by the maternal grandmother after the death of the child's mother. This Court had reversed the trial court's order, but the Supreme Court disagreed and reversed this Court based upon the trial court's findings that the grandmother "failed to carry her burden of demonstrating that [the] defendant forfeited his protected status. The evidence of record supports the trial court's findings of fact, which in turn support its legal conclusion that [the] defendant's protected status as parent was not constitutionally displaced." *Id.*

As to the law regarding the Fifth Amendment right against self-incrimination or the marital privilege, it is well-established that application and operation of these

---

[2] One portion of *Adams v. Tessener* is instructive here:

> Turning to the present case, we first note that in custody cases, the trial court sees the parties in person and listens to all the witnesses. This allows the trial court to detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges. Accordingly, the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary.

*Id.* at 63, 550 S.E.2d at 503 (citation and quotation marks omitted).

protections against testifying is different in a civil proceeding with the primary goal of protecting the best interest of a minor child than in a criminal prosecution. *See In re L.G.A.*, 277 N.C. App. 46, 50-51, 857 S.E.2d 761, 766 (2021) (holding the mother was not entitled to a continuance of the hearing on motion for review in a neglect proceeding based upon the argument she would be "effectively prevented from testifying to avoid waiver of her Fifth Amendment rights against self-incrimination" due to pending criminal charges against her, based upon North Carolina General Statute Section 7B-803 (2013), which holds that "[r]esolution of a pending criminal charge against a respondent arising out of the same transaction or occurrence as the juvenile petition shall not be the sole extraordinary circumstance for granting a continuance" (quoting N.C. Gen. Stat. § 7B-803 (2013))); *see also In re Pittman*, 149 N.C. App. 756, 761, 561 S.E.2d 560, 564 (2002) ("Here, the child's interest in being protected from abuse and neglect is paramount."); *Qurneh v. Colie*, 122 N.C. App. 553, 558-59, 471 S.E.2d 433, 436 (1996) ("The privilege against self-incrimination is intended to be a shield and not a sword. Here, the plaintiff attempted to assert the privilege as both a shield and a sword. . . . Due to the plaintiff's refusal to answer questions regarding illegal drug use, trafficking and other drug involvement, the trial court was unable to consider pertinent information in determining plaintiff's fitness. As a policy matter, issues such as custody should only be decided after careful consideration of all pertinent evidence in order to ensure the best interests of the child are protected. Plaintiff's decision not to answer certain questions relating to his

past illegal drug activity by invoking his fifth amendment privilege prevented the court from determining his fitness and necessitated the dismissal of his claim." (citations and quotation marks omitted)).

In addition to cases recognizing the difference between civil proceedings involving protection of a child and criminal prosecutions, Chapter 7B explicitly sets out this difference in proceedings for abuse, neglect, or dependency:

> No privilege shall be grounds for any person or institution failing to report that a juvenile may have been abused, neglected, or dependent, even if the knowledge or suspicion is acquired in an official professional capacity, except when the knowledge or suspicion is gained by an attorney from that attorney's client during representation only in the abuse, neglect, or dependency case. No privilege, except the attorney-client privilege, shall be grounds for excluding evidence of abuse, neglect, or dependency in any judicial proceeding (civil, criminal, or juvenile) in which a juvenile's abuse, neglect, or dependency is in issue nor in any judicial proceeding resulting from a report submitted under this Article, both as this privilege relates to the competency of the witness and to the exclusion of confidential communications.

N.C. Gen. Stat. § 7B-310. Even in a proceeding for termination of parental rights—not the case we are considering here—as noted earlier, Chapter 7B sets out the standard of proof of "clear, cogent, and convincing evidence" and specifically provides that "[n]o husband-wife or physician-patient privilege shall be grounds for excluding any evidence regarding the existence or nonexistence of any circumstance authorizing the termination of parental rights." N.C. Gen. Stat. § 7B-1109(f).

If one parent has knowledge that the other parent has harmed a child, the

parent has an obligation to protect the child by providing information about the abuse. In a criminal prosecution or a civil proceeding which may result in imprisonment, a defendant's silence may not be used against him. *See Lowder v. All Star Mills, Inc.*, 301 N.C. 561, 584, 273 S.E.2d 247, 260 (1981) ("The fifth amendment to the United States Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. Although the fifth amendment privilege against compulsory testimonial self-incrimination is ordinarily asserted in criminal proceedings, its protection also extends to civil proceedings where a party may be subjected to imprisonment." (citation and quotation marks omitted)). But in a civil proceeding for abuse or neglect under Chapter 7B, a party's silence may allow the trial court to draw a negative inference because the purpose of this proceeding is to protect the children's best interests. *See In re Pittman*, 149 N.C. App. at 760-61, 561 S.E.2d at 564-65 ("We acknowledge the mother's argument that because an abuse and neglect proceeding can result in removal of a child from a parent's custody, a parent's constitutionally protected interest is at stake. However, the common thread running throughout the Juvenile Code, § 7B-100 *et seq.*, is that the court's primary concern must be the child's best interest. When determining the best interest of a child, any evidence which is competent and relevant to a showing of the best interest of that child must be heard and considered by the trial court, subject to the discretionary powers of the trial court to exclude cumulative testimony. Without hearing and considering such evidence, the trial court cannot make an informed and

intelligent decision concerning the best interest of the child. Here, the child's interest in being protected from abuse and neglect is paramount. While the mother is not prevented from attempting to suppress her statement to Officer Batchelor in any subsequent criminal proceeding, the mother is barred from doing so in this civil proceeding where the protection of the child's interests, as distinguished from the mother's interests, is the overriding consideration." (citation and quotation marks omitted)).

The majority directs the trial court to make additional findings of fact on remand about circumstances which simply may not exist in this case, but those findings are not necessary. But of more concern, the majority seems to be barring the trial court from drawing negative inferences against either parent based upon their refusal or inability to explain what happened to E.H. In effect, the majority is directing the trial court to ignore its conviction, formed after considering extensive evidence and testimony, that R.H. is at risk of abuse by either Mother or Father, considering the type of trauma which would have been required to cause E.H.'s injuries, because one parent physically abused E.H., and the other parent is either protecting the abusing parent or is unable to protect the children from the abusing parent. But in cases with this sort of fact pattern, the trial court is often compelled to rely upon logical inferences from the established facts of the case. In *In re J.M.*, 384 N.C. 584, 604, 887 S.E.2d 823, 836 (2023), our Supreme Court affirmed the trial court's order removing "two young children from the custody of their parents after

one or both parents inflicted life-threatening injuries on the youngest child, then just six weeks old." The youngest child was injured; the older child was not. *Id.* at 586, 887 S.E.2d at 825. The Supreme Court noted the similarities with *In re D.W.P.*, 373 N.C. 327, 838 S.E.2d 396:

> The parallels between *In re D.W.P.* and this case are obvious and compelling. Each case involves the serious physical abuse of an infant at home and in the care of two adults. In each case, the trial court found that the two caregivers were the only persons who could have inflicted the abuse. Moreover, while the mother in each case suggested that she was elsewhere in the home when the abuse took place, she refused to blame her partner or to supply any other plausible explanation for the infant's injuries. The explanations that were offered in each case bordered on the absurd, with the mother in *In re D.W.P.* blaming the family dog or strange sleep positions for the harm to her child and respondent-father in the present case theorizing that a difficult bowel movement accounted for Nellie's injuries. In each case, the trial court found that parental inability or unwillingness to confront the cause of the abuse prevented the parent(s) from adequately mitigating the risk of further abuse or neglect.

*In re J.M.*, 384 N.C. at 601, 887 S.E.2d at 834. In all of these cases, one or more older children were also removed from the home based primarily or solely upon serious nonaccidental injury to an infant sibling in the home. As in *In re J.M.*, here the trial court was "[f]aced with the gravity of the abuse and the persistent unwillingness of either parent to admit responsibility or to fault the other" and it concluded that the children could be protected only by removal from the home. *Id.* at 604, 887 S.E.2d at 836. And as in *In re M.T.*,

14

> [t]he trial court's job, ultimately, is to make hard decisions based upon the evidence presented, with the best interests of these two young children, [E.H. and R.H.], as its primary consideration. And our job, as an appellate court, is to determine if the trial court did that job correctly, in accord with the law. Because the trial court did that difficult job correctly, [I would] affirm the trial court's order.

285 N.C. App. at 307, 877 S.E.2d at 736. I therefore concur in part and dissent in part.

15